# WEST VIRGINIA UNIVERSITY HOSPITALS, INC. *v.* CASEY, GOVERNOR OF PENNSYLVANIA, ET AL.

No. 89–994.   Argued October 9, 1990—Decided March 19, 1991

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. MARSHALL, J., filed a dissenting opinion, *post*, p. 102. STEVENS, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 103.

*Robert T. Adams* argued the cause for petitioner. With him on the briefs was Jack M. Stover.

*Calvin R. Koons*, Senior Deputy Attorney General of Pennsylvania, argued the cause for respondents. With him on the brief were *Ernest D. Preate, Jr.*, Attorney General, *Jerome T. Foerster*, Deputy Attorney General, and *John G. Knorr III*, Chief Deputy Attorney General.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether fees for services rendered by experts in civil rights litigation may be shifted to the losing party pursuant to 42 U. S. C. § 1988, which permits the award of "a reasonable attorney's fee."

_____

*David S. Tatel, Norman Redlich, Robert B. McDuff, Steven R. Shapiro, Harvey Grossman, Sidney S. Rosdeitcher, Antonia Hernandez*, and *E. Richard Larson* filed a brief for the Lawyers' Committee for Civil Rights Under Law et al. as *amici curiae* urging reversal.

*Robert E. Williams, Douglas S. McDowell*, and *Garen E. Dodge* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

## I

Petitioner West Virginia University Hospitals, Inc. (WVUH), operates a hospital in Morgantown, W. Va., near the Pennsylvania border. The hospital is often used by Medicaid recipients living in southwestern Pennsylvania. In January 1986, Pennsylvania's Department of Public Welfare notified WVUH of new Medicaid reimbursement schedules for services provided to Pennsylvania residents by the Morgantown hospital. In administrative proceedings, WVUH unsuccessfully objected to the new reimbursement rates on both federal statutory and federal constitutional grounds. After exhausting administrative remedies, WVUH filed suit in Federal District Court under 42 U. S. C. § 1983. Named as defendants (respondents here) were Pennsylvania Governor Robert Casey and various other Pennsylvania officials.

Counsel for WVUH employed Coopers & Lybrand, a national accounting firm, and three doctors specializing in hospital finance to assist in the preparation of the lawsuit and to testify at trial. WVUH prevailed at trial in May 1988. The District Court subsequently awarded fees pursuant to 42 U. S. C. § 1988,[1] including over $100,000 in fees attributable to expert services. The District Court found these services to have been "essential" to presentation of the case—a finding not disputed by respondents.

Respondents appealed both the judgment on the merits and the fee award. The Court of Appeals for the Third Circuit affirmed as to the former, but reversed as to the expert fees, disallowing them except to the extent that they fell within the $30-per-day fees for witnesses prescribed by 28 U. S. C. § 1821(b). 885 F. 2d 11 (1989). WVUH petitioned

---

[1] Title 42 U. S. C. § 1988 provides in relevant part: "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 . . . , or title VI of the Civil Rights Act of 1964 . . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

this Court for review of that disallowance; we granted certiorari, 494 U. S. 1003 (1990).

## II

Title 28 U. S. C. § 1920 provides:

> "A judge or clerk of any court of the United States may tax as costs the following:
>
> "(1) Fees of the clerk and marshal;
>
> "(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>
> "(3) Fees and disbursements for printing and witnesses;
>
> "(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
>
> "(5) Docket fees under section 1923 of this title;
>
> "(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."

Title 28 U. S. C. § 1821(b) limits the witness fees authorized by § 1920(3) as follows: "A witness shall be paid an attendance fee of $30 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance. . . ."[2] In *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S. 437 (1987), we held that these provisions define the full extent of a federal court's power to shift litigation costs absent express statutory authority to go further. "[W]hen," we said, "a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limits of § 1821(b), absent contract or explicit statutory authority to the contrary." *Id.*, at 439. "We will

---

[2] Section 1821(b) has since been amended to increase the allowable per diem from $30 to $40. See Judicial Improvements Act of 1990, Pub. L. 101–650, § 314.

not lightly infer that Congress has repealed §§ 1920 and 1821, either through [Federal Rule of Civil Procedure] 54(d) or any other provision not referring explicitly to witness fees." *Id.*, at 445.

As to the testimonial services of the hospital's experts, therefore, *Crawford Fitting* plainly requires, as a prerequisite to reimbursement, the identification of "explicit statutory authority." WVUH argues, however, that some of the expert fees it incurred in this case were unrelated to expert *testimony*, and that as to those fees the § 1821(b) limits, which apply only to witnesses in attendance at trial, are of no consequence. We agree with that, but there remains applicable the limitation of § 1920. *Crawford Fitting* said that we would not lightly find an implied repeal of § 1821 *or* of § 1920, which it held to be an express limitation upon the types of costs which, absent other authority, may be shifted by federal courts. 482 U. S., at 441. None of the categories of expenses listed in § 1920 can reasonably be read to include fees for services rendered by an expert employed by a party in a nontestimonial advisory capacity. The question before us, then, is — with regard to both testimonial and nontestimonial expert fees — whether the term "attorney's fee" in § 1988 provides the "explicit statutory authority" required by *Crawford Fitting*.[3]

---

[3] JUSTICE STEVENS suggests that the expert fees requested here might be part of the "costs" allowed by § 1988 even if they are not part of the "attorney's fee." We are aware of no authority to support the counterintuitive assertion that "[t]he term 'costs' has a different and broader meaning in fee-shifting statutes than it has in the cost statutes that apply to ordinary litigation," *post*, at 104. In *Crawford Fitting* we held that the word "costs" in Federal Rule of Civil Procedure 54(d) is to be read in harmony with the word "costs" in 28 U. S. C. § 1920, see 482 U. S., at 441, 445, and we think the same is true of the word "costs" in § 1988. We likewise see nothing to support JUSTICE STEVENS' speculation that the court below or the parties viewed certain disbursements by the hospital's attorneys as "costs" within the meaning of the statute. Rather, it is likely that these disbursements (billed directly to the client) were thought subsumed

## III

The record of statutory usage demonstrates convincingly that attorney's fees and expert fees are regarded as separate elements of litigation cost. While some fee-shifting provisions, like § 1988, refer only to "attorney's fees," see, *e. g.*, Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(k), many others explicitly shift expert witness fees *as well as* attorney's fees. In 1976, just over a week prior to the enactment of § 1988, Congress passed those provisions of the Toxic Substances Control Act, 15 U. S. C. §§ 2618(d), 2619(c)(2), which provide that a prevailing party may recover "the costs of suit and reasonable fees for attorneys *and expert witnesses*." (Emphasis added.) Also in 1976, Congress amended the Consumer Product Safety Act, 15 U. S. C. §§ 2060(c), 2072(a), 2073, which as originally enacted in 1972 shifted to the losing party "cost[s] of suit, including a reasonable attorney's fee," see 86 Stat. 1226. In the 1976 amendment, Congress altered the fee-shifting provisions to their present form by adding a phrase shifting expert witness fees *in addition to* attorney's fees. See Pub. L. 94–284, § 10, 90 Stat. 506, 507. Two other significant Acts passed in 1976 contain similar phrasing: the Resource Conservation and Recovery Act of 1976, 42 U. S. C. § 6972(e) ("costs of litigation (including reasonable attorney and expert witness fees)"), and the Natural Gas Pipeline Safety Act Amendments of 1976, 49 U. S. C. App. § 1686(e) ("costs of suit, including reasonable attorney's fees and reasonable expert witnesses fees").

Congress enacted similarly phrased fee-shifting provisions in numerous statutes both before 1976, see, *e. g.*, Endangered Species Act of 1973, 16 U. S. C. § 1540(g)(4) ("costs of litigation (including reasonable attorney and expert witness

---

within the phrase "attorney's fee." See, *e. g.*, *Northcross* v. *Board of Ed. of Memphis Schools*, 611 F. 2d 624, 639 (CA6 1979) ("reasonable out-of-pocket expenses incurred by the attorney" included in § 1988 "attorney's fee" award).

fees)"), and afterwards, see, *e. g.*, Public Utility Regulatory Policies Act of 1978, 16 U. S. C. § 2632(a)(1) ("reasonable attorneys' fees, expert witness fees, and other reasonable costs incurred in preparation and advocacy of [the litigant's] position"). These statutes encompass diverse categories of legislation, including tax, administrative procedure, environmental protection, consumer protection, admiralty and navigation, utilities regulation, and, significantly, civil rights: The Equal Access to Justice Act (EAJA), the counterpart to § 1988 for violation of federal rights by federal employees, states that "'fees and other expenses' [as shifted by § 2412(d)(1)(A)] includes the reasonable expenses of expert witnesses . . . and reasonable attorney fees." 28 U. S. C. § 2412(d)(2)(A). At least 34 statutes in 10 different titles of the United States Code explicitly shift attorney's fees *and* expert witness fees.[4]

---

[4] In addition to the provisions discussed in the text, see Administrative Procedure Act, 5 U. S. C. § 504(b)(1)(A) (added 1980) ("reasonable expenses of expert witnesses . . . and reasonable attorney or agent fees"); Federal Trade Commission Act, 15 U. S. C. § 57a(h)(1) (added 1975) ("reasonable attorneys' fees, expert witness fees and other costs of participating in a rulemaking proceeding"); Petroleum Marketing Practices Act, 15 U. S. C. §§ 2805(d)(1)(C), 2805(d)(3) ("reasonable attorney and expert witness fees"); National Historic Preservation Act Amendments of 1980, 16 U. S. C. § 470w–4 ("attorneys' fees, expert witness fees, and other costs of participating in such action"); Federal Power Act, 16 U. S. C. § 825q–1(b)(2) (added 1978) ("reasonable attorney's fees, expert witness fees and other costs of intervening or participating in any proceeding [before the Federal Energy Regulatory Commission]"); Tax Equity and Fiscal Responsibility Act of 1982, 26 U. S. C. § 7430(c)(1) ("reasonable expenses of expert witnesses . . . and reasonable fees paid . . . for the services of attorneys"); Surface Mining Control and Reclamation Act of 1977, 30 U. S. C. § 1270(d) ("costs of litigation (including attorney and expert witness fees)"); Deep Seabed Hard Mineral Resources Act, 30 U. S. C. § 1427(c) (enacted 1980) ("costs of litigation, including reasonable attorney and expert witness fees"); Federal Oil and Gas Royalty Management Act of 1982, 30 U. S. C. § 1734(a)(4) ("costs of litigation including reasonable attorney and expert witness fees"); Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, 33 U. S. C. § 928(d) ("In cases

The laws that refer to fees for nontestimonial expert services are less common, but they establish a similar usage both before and after 1976: Such fees are referred to *in addition to* attorney's fees when a shift is intended. A provision of the Criminal Justice Act of 1964, 18 U. S. C. § 3006A(e), directs the court to reimburse appointed counsel for expert fees necessary to the defense of indigent criminal defendants—even though the immediately preceding provision, § 3006A(d), already directs that appointed defense counsel be paid a designated hourly rate plus "expenses reasonably incurred." WVUH's position must be that expert fees billed to a client through an attorney are "attorney's fees" because they are

where an attorney's fee is awarded . . . there may be further assessed . . . as costs, fees and mileage for necessary witnesses"); Federal Water Pollution Control Act Amendments of 1972, and 1987 amendment, 33 U. S. C. §§ 1365(d), 1369(b)(3) ("costs of litigation (including reasonable attorney and expert witness fees)"); Oil Pollution Act of 1990, 33 U. S. C. § 2706(g) (1988 ed., Supp. II) (same); Marine Protection, Research, and Sanctuaries Act of 1972, 33 U. S. C. § 1415(g)(4) (same); Deepwater Port Act of 1974, 33 U. S. C. § 1515(d) (same); Act to Prevent Pollution from Ships, 33 U. S. C. § 1910(d) (enacted 1980) (same); Safe Drinking Water Act, 42 U. S. C. § 300j–8(d) (enacted 1974) (same); National Childhood Vaccine Injury Act of 1986, 42 U. S. C. § 300aa–31(c) (same); Noise Control Act of 1972, 42 U. S. C. § 4911(d) (same); Energy Reorganization Act of 1974, 42 U. S. C. § 5851(e)(2) (same); Energy Policy and Conservation Act, 42 U. S. C. § 6305(d) (enacted 1975) (same); Clean Air Amendments of 1970, 42 U. S. C. §§ 7413b, 7604(d), 7607(f) (same), and of 1977, 42 U. S. C. § 7622(b)(2)(B) ("all costs and expenses (including attorneys' and expert witness fees) reasonably incurred"); Powerplant and Industrial Fuel Use Act of 1978, 42 U. S. C. § 8435(d) ("costs of litigation (including reasonable attorney and expert witness fees)"); Ocean Thermal Energy Conversion Act of 1980, 42 U. S. C. § 9124(d) (same); Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U. S. C. § 9659(f) (added 1986) (same); Emergency Planning and Community Right-to-Know Act of 1986, 42 U. S. C. § 11046(f) (same); Outer Continental Shelf Lands Act Amendments of 1978, 43 U. S. C. § 1349(a)(5) ("costs of litigation, including reasonable attorney and expert witness fees"); Hazardous Liquid Pipeline Safety Act of 1979, 49 U. S. C. App. § 2014(e) ("costs of suit, including reasonable attorney's fees and reasonable expert witnesses fees").

to be treated as part of the expenses of the attorney; but if this were normal usage, they would have been reimbursable under the Criminal Justice Act as "expenses reasonably incurred"—and subsection 3006A(e) would add nothing to the recoverable amount. The very heading of that subsection, "Services *other than* counsel" (emphasis added), acknowledges a distinction between services provided by the attorney himself and those provided to the attorney (or the client) by a nonlegal expert.

To the same effect is the 1980 EAJA, which provides: "'fees and other expenses' [as shifted by § 2412(d)(1)(A)] includes the reasonable expenses of expert witnesses, *the reasonable cost of any study, analysis, engineering report, test, or project* which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees." 28 U. S. C. § 2412(d)(2)(A) (emphasis added). If the reasonable cost of a "study" or "analysis"—which is but another way of describing nontestimonial expert services—is by common usage already included in the "attorney fees," again a significant and highly detailed part of the statute becomes redundant. The Administrative Procedure Act, 5 U. S. C. § 504(b)(1)(A) (added 1980), and the Tax Equity and Fiscal Responsibility Act of 1982, 26 U. S. C. § 7430(c)(1), contain similar language. Also reflecting the same usage are two railroad regulation statutes, the Regional Rail Reorganization Act of 1973, 45 U. S. C. §§ 726(f)(9) ("costs and expenses (including reasonable fees of accountants, experts, and attorneys) actually incurred"), and 741(i) ("costs and expenses (including fees of accountants, experts, and attorneys), actually and reasonably incurred"), and the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U. S. C. § 854(g) ("costs and expenses (including fees of accountants, experts, and attorneys) actually and reasonably incurred").[5]

---

[5] WVUH cites a House Conference Committee Report from a statute passed in 1986, stating: "The conferees intend that the term 'attorneys'

We think this statutory usage shows beyond question that attorney's fees and expert fees are distinct items of expense. If, as WVUH argues, the one includes the other, dozens of statutes referring to the two separately become an inexplicable exercise in redundancy.

## IV

WVUH argues that at least in pre-1976 *judicial* usage the phrase "attorney's fees" included the fees of experts. To support this proposition, it relies upon two historical assertions: first, that pre-1976 courts, when exercising traditional equitable discretion in shifting attorney's fees, taxed as an element of such fees the expenses related to expert services; and second, that pre-1976 courts shifting attorney's fees pursuant to statutes identical in phrasing to § 1988 allowed the recovery of expert fees. We disagree with these assertions. The judicial background against which Congress enacted § 1988 mirrored the statutory background: Expert fees were regarded not as a subset of attorney's fees, but as a distinct category of litigation expense.

Certainly it is true that prior to 1976 some federal courts shifted expert fees to losing parties pursuant to various equitable doctrines—sometimes in conjunction with attorney's fees. But they did not shift them *as an element of* attorney's fees. Typical of the courts' mode of analysis (though not necessarily of their results) is *Fey* v. *Walston & Co.*, 493 F. 2d 1036, 1055–1056 (CA7 1974), a case brought under the federal securities laws. Plaintiff won and was awarded various ex-

---

fees as part of the costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the . . . case." H. R. Conf. Rep. No. 99–687, p. 5 (1986) (discussing the Handicapped Children's Protection Act of 1986, 20 U. S. C. § 1415(e)(4)(B)). In our view this undercuts rather than supports WVUH's position: The specification would have been quite unnecessary if the ordinary meaning of the term included those elements. The statement is an apparent effort to *depart* from ordinary meaning and to define a term of art.

penses: "Included in the . . . costs awarded by the [district] court were the sum of $1,700 for plaintiff's expert witness, expenses of an accountant in the amount of $142, and of an illustrator-diagrammer for $50 . . . and attorneys' fees of $15,660." The court treated these items separately: The services of the accountant and illustrator (who did not testify at trial) were "costs" which could be fully shifted in the discretion of the District Court; the expert witness fees also could be shifted, but only as limited by § 1821; the attorney's fees were not costs and could not be shifted at all because the case did not fit any of the traditional equitable doctrines for awarding such fees. *Id.*, at 1056. See also *In re Electric Power & Light Corp.*, 210 F. 2d 585, 587, 591 (CA2 1954) ("[Appellant] applied for an allowance for counsel fees of $35,975 and expenses . . . , and also for a fee of $2,734.28 for an expert accountant"; court permitted part of the attorney's fee but disallowed the expert witness fee), rev'd on other grounds *sub nom. SEC* v. *Drexel & Co.*, 348 U. S. 341 (1955); *Kiefel* v. *Las Vegas Hacienda, Inc.*, 404 F. 2d 1163, 1170–1171 (CA7 1968) (itemizing attorney's fee and expert witness fee separately, allowing part of the former and all of the latter permitted by § 1821); *Burgess* v. *Williamson*, 506 F. 2d 870, 877–880 (CA5 1975) (applying Alabama law to shift attorney's fee but not expert witness fee); *Henning* v. *Lake Charles Harbor and Terminal District*, 387 F. 2d 264, 267–268 (CA5 1968), on appeal after remand, 409 F. 2d 932, 937 (CA5 1969) (applying Louisiana law to shift expert fees but not attorney's fee); *Coughenour* v. *Campbell Barge Line, Inc.*, 388 F. Supp. 501, 506 (WD Pa. 1974) ("Plaintiffs' claim for counsel fees is denied [because defendant acted in good faith and thus equitable shifting is unavailable]. Plaintiff's claim for costs of medical expert witnesses is deemed proper insofar as they were necessary in establishing the claim . . .") (citations omitted).

Even where the courts' holdings treated attorney's fees and expert fees the same (*i. e.*, granted both or denied both),

their analysis discussed them as separate categories of expense. See, *e. g., Wolf* v. *Frank*, 477 F. 2d 467, 480 (CA5 1973) ("The reimbursing of plaintiffs' costs for attorney's fees *and* expert witness fees is supported . . . by well established equitable principles") (emphasis added); *Kinnear-Weed Corp.* v. *Humble Oil & Refining Co.*, 441 F. 2d 631, 636–637 (CA5 1971) ("[Appellant] argues that the district court erred in awarding costs, including attorneys' fees and expert witness fees to Humble"); *Bebchick* v. *Pub. Util. Comm'n*, 115 U. S. App. D. C. 216, 233, 318 F. 2d 187, 204 (1963) ("It is also our view that reasonable attorneys' fees for appellants, . . . reasonable expert witness fees, and appropriate litigation expenses, should be paid by [appellee]"); *Lipscomb* v. *Wise*, 399 F. Supp. 782, 798–801 (ND Tex. 1975) (in separate analyses, finding both attorney's fees and expert witness fees barred). We have found no support for the proposition that, at common law, courts shifted expert fees *as an element of* attorney's fees.

Of arguably greater significance than the courts' treatment of attorney's fees *versus* expert fees at common law is their treatment of those expenses under statutes containing fee-shifting provisions similar to § 1988. WVUH contends that in some cases courts shifted expert fees as well as the statutorily authorized attorney's fees—and thus must have thought that the latter included the former. We find, however, that the practice, at least in the overwhelming majority of cases, was otherwise.

Prior to 1976, the leading fee-shifting statute was the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 15 (shifting "the cost of suit, including a reasonable attorney's fee"). As of 1976, four Circuits (six Circuits, if one includes summary affirmances of district court judgments) had held that this provision did not permit a shift of expert witness fees. *Union Carbide & Carbon Corp.* v. *Nisley*, 300 F. 2d 561, 586–587 (CA10 1961) (accountant's fees); *Twentieth Century Fox Film Corp.* v. *Goldwyn*, 328 F. 2d 190, 223–224 (CA9

1964) (accounting fees); *Advance Business Systems & Supply Co.* v. *SCM Corp.*, 287 F. Supp. 143, 164 (Md. 1968) (accountant's fees), aff'd, 415 F. 2d 55 (CA4 1969); *Farmington Dowel Products Co.* v. *Forster Mfg. Co.*, 297 F. Supp. 924, 930 (Me.) (expert witness fees), aff'd, 421 F. 2d 61 (CA1 1969); *Trans World Airlines, Inc.* v. *Hughes*, 449 F. 2d 51, 81 (CA2 1971) (expert fees), rev'd on other grounds, 409 U. S. 363 (1973); *Ott* v. *Speedwriting Publishing Co.*, 518 F. 2d 1143, 1149 (CA6 1975) (expert witness fees); see also *Brookside Theater Corp.* v. *Twentieth Century-Fox Film Corp.*, 11 F. R. D. 259, 267 (WD Mo. 1951) (expert witness fees). No court had held otherwise. Also instructive is pre-1976 practice under the federal patent laws, which provided, 35 U. S. C. § 285, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Again, every court to consider the matter as of 1976 thought that this provision conveyed no authority to shift expert fees. *Specialty Equipment & Machinery Corp.* v. *Zell Motor Car Co.*, 193 F. 2d 515, 521 (CA4 1952) ("Congress having dealt with the subject of costs in patent cases and having authorized the taxation of reasonable attorneys fees without making any provision with respect to . . . fees of expert witnesses must presumably have intended that they be not taxed"); accord, *Chromalloy American Corp.* v. *Alloy Surfaces Co.*, 353 F. Supp. 429, 431, n. 1, 433 (Del. 1973); *ESCO Corp.* v. *Tru-Rol Co.*, 178 USPQ 332, 333 (Md. 1973); *Scaramucci* v. *Universal Mfg. Co.*, 234 F. Supp. 290, 291–292 (WD La. 1964); *Prashker* v. *Beech Aircraft Corp.*, 24 F. R. D. 305, 313 (Del. 1959).

WVUH contends that its position is supported by *Tasby* v. *Estes*, 416 F. Supp. 644, 648 (ND Tex. 1976), and *Davis* v. *County of Los Angeles*, 8 FEP Cases 244, 246 (CD Cal. 1974). Even if these cases constituted solid support for the proposition advanced by the hospital, they would hardly be sufficient to overcome the weight of authority cited above. But, in any case, we find neither opinion to be a clear example of con-

trary usage. Without entering into a detailed discussion, it suffices to say, as to *Davis* (where the expert fee award was in any event uncontested), that the opinion does not cite the statute, 42 U. S. C. § 2000e–5, as the basis for its belief that the expert fee could be shifted, and considers expert fees in a section separate from that dealing with attorney's fees. Given what was then the state of the law in the Ninth Circuit, and the District Court's citation, 8 FEP Cases, at 246, of at least one case that is avowedly an equitable discretion case, see *NAACP* v. *Allen*, 340 F. Supp. 703 (MD Ala. 1972), it is likely that the District Court thought the shifting of the fee was authorized under its general equitable powers, or under Federal Rule of Civil Procedure 54(d). As for *Tasby*, that case unquestionably authorized a shift of expert witness fees pursuant to an attorney's-fee-shifting statute, 20 U. S. C. § 1617 (1976 ed.). The basis of that decision, however, was not the court's own understanding of the statutory term "attorney's fees," but rather its belief (quite erroneous) that our earlier opinion in *Bradley* v. *Richmond School Bd.*, 416 U. S. 696 (1974), had adopted that interpretation. Thus, WVUH has cited not a single case, and we have found none, in which it is clear (or in our view even likely) that a court understood the statutory term "attorney's fees" to include expert fees.[6]

---

[6] The hospital also cites *Fairley* v. *Patterson*, 493 F. 2d 598 (CA5 1974), and *Norris* v. *Green*, 317 F. Supp. 100, 102 (ND Ala. 1965). But in *Fairley* the court, remanding for reconsideration of the fee award, was explicitly equivocal as to whether "court costs" other than the ones normally assessable under § 1920 were awardable under the statute in question (the Voting Rights Act of 1965, whose fee-shifting provision parallels § 1988), or rather "should have to meet the harder discretionary standards" applicable to the award of fees pursuant to equitable discretion. 493 F. 2d, at 606, n. 11. In any event, *Fairley* did not consider expert witnesses explicitly, and there is no indication that the court necessarily included expert fees within its (undefined) category of "court costs."

As for *Norris*, that case awarded fees pursuant to 29 U. S. C. § 501(b), which is *not* parallel to § 1988, since it authorizes the shifting of "fees of

In sum, we conclude that at the time this provision was enacted neither statutory nor judicial usage regarded the phrase "attorney's fees" as embracing fees for experts' services.

## V

WVUH suggests that a distinctive meaning of "attorney's fees" should be adopted with respect to § 1988 because this statute was meant to overrule our decision in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975). As mentioned above, prior to 1975 many courts awarded expert fees and attorney's fees in certain circumstances pursuant to their equitable discretion. In *Alyeska*, we held that this discretion did not extend beyond a few exceptional circumstances long recognized by common law. Specifically, we rejected the so-called "private attorney general" doctrine recently created by some lower federal courts, see, *e. g., La Raza Unida* v. *Volpe*, 57 F. R. D. 94, 98–102 (ND Cal. 1972), which allowed equitable fee shifting to plaintiffs in certain types of civil rights litigation. 421 U. S., at 269. WVUH argues that § 1988 was intended to restore the pre-*Alyeska* regime—and that, since expert fees were shifted then, they should be shifted now.

Both chronology and the remarks of sponsors of the bill that became § 1988 suggest that at least some members of Congress viewed it as a response to *Alyeska*. See, *e. g.,* S. Rep. No. 94–1011, pp. 4, 6 (1976). It is a considerable step, however, from this proposition to the conclusion the hospital would have us draw, namely, that § 1988 should be read as a reversal of *Alyeska* in all respects.

By its plain language and as unanimously construed in the courts, § 1988 is both broader and narrower than the pre-*Alyeska* regime. Before *Alyeska*, civil rights plaintiffs could

counsel . . . *and . . . expenses necessarily paid or incurred.*" (Emphasis added.) There is no indication in the opinion that the court thought the expert fees were part of the former rather than the latter—and the court discussed them separately from attorney's fees.

recover fees pursuant to the private attorney general doctrine only if private enforcement was necessary to defend important rights benefiting large numbers of people, and cost barriers might otherwise preclude private suits. *La Raza Unida, supra,* at 98–101. Section 1988 contains no similar limitation—so that in the present suit there is no question as to the propriety of shifting WVUH's *attorney's* fees, even though it is highly doubtful they could have been awarded under pre-*Alyeska* equitable theories. In other respects, however, § 1988 is not as broad as the former regime. It is limited, for example, to violations of specified civil rights statutes—which means that it would not have reversed the outcome of *Alyeska* itself, which involved not a civil rights statute but the National Environmental Policy Act of 1969, 42 U. S. C. § 4321 *et seq.* Since it is clear that, in many respects, § 1988 was not meant to return us precisely to the pre-*Alyeska* regime, the objective of achieving such a return is no reason to depart from the normal import of the text.

WVUH further argues that the congressional purpose in enacting § 1988 must prevail over the ordinary meaning of the statutory terms. It quotes, for example, the House Committee Report to the effect that "the judicial remedy [must be] full and complete," H. R. Rep. No. 94–1558, p. 1 (1976), and the Senate Committee Report to the effect that "[c]itizens must have the opportunity to recover what it costs them to vindicate [civil] rights in court," S. Rep. No. 94–1011, *supra,* at 2. As we have observed before, however, the purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone. See *Rodriguez* v. *United States,* 480 U. S. 522, 525–526 (1987). The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the

course of the enactment process. See *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms'"), quoting *Caminetti* v. *United States*, 242 U. S. 470, 485 (1917). Congress could easily have shifted "attorney's fees and expert witness fees," or "reasonable litigation expenses," as it did in contemporaneous statutes; it chose instead to enact more restrictive language, and we are bound by that restriction.

WVUH asserts that we have previously been guided by the "broad remedial purposes" of § 1988, rather than its text, in a context resolving an "analogous issue": In *Missouri* v. *Jenkins*, 491 U. S. 274, 285 (1989), we concluded that § 1988 permitted separately billed paralegal and law clerk time to be charged to the losing party. The trouble with this argument is that *Jenkins* did *not* involve an "analogous issue," insofar as the relevant considerations are concerned. The issue there was not, as WVUH contends, whether we would permit our perception of the "policy" of the statute to overcome its "plain language." It was not remotely plain in *Jenkins* that the phrase "attorney's fee" did not include charges for law clerk and paralegal services. Such services, like the services of "secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product," *id.*, at 285, had traditionally been included in calculation of the lawyers' hourly rates. Only recently had there arisen "the 'increasingly widespread custom of separately billing for [such] services,'" *id.*, at 286 (quoting from *Ramos* v. *Lamm*, 713 F. 2d 546, 558 (CA10 1983)). By contrast, there has never been, to our knowledge, a practice of including the cost of expert services within attorneys' hourly rates. There was also no record in *Jenkins*—as there is a lengthy record here—of statutory usage that recognizes a distinction between the charges at issue and attorney's fees. We do not know of a single statute that shifts clerk or paralegal fees separately; and even those, such as the EAJA, which comprehensively

define the assessable "litigation costs" make no separate mention of clerks or paralegals. In other words, *Jenkins* involved a respect in which the term "attorney's fees" (giving the losing argument the benefit of the doubt) was genuinely ambiguous; and we resolved that ambiguity not by invoking some policy that supersedes the text of the statute, but by concluding that charges of this sort had traditionally been included in attorney's fees and that separate billing should make no difference. The term's application to expert fees is not ambiguous; and if it were the means of analysis employed in *Jenkins* would lead to the conclusion that since such fees have not traditionally been included within the attorney's hourly rate they are not attorney's fees.

WVUH's last contention is that, even if Congress plainly did not include expert fees in the fee-shifting provisions of § 1988, it would have done so had it thought about it. Most of the pre-§ 1988 statutes that explicitly shifted expert fees dealt with environmental litigation, where the necessity of expert advice was readily apparent; and when Congress later enacted the EAJA, the federal counterpart of § 1988, it explicitly included expert fees. Thus, the argument runs, the 94th Congress simply forgot; it is our duty to ask how they would have decided had they actually considered the question. See *Friedrich* v. *Chicago*, 888 F. 2d 511, 514 (CA7 1989) (awarding expert fees under § 1988 because a court should "complete . . . the statute by reading it to bring about the end that the legislators would have specified had they thought about it more clearly").

This argument profoundly mistakes our role. Where a statutory term presented to us for the first time is ambiguous, we construe it to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law. See 2 J. Sutherland, Statutory Construction § 5201 (3d F. Horack ed. 1943). We do so not because that precise accommodative meaning is what the lawmakers must have had in mind (how could an

earlier Congress know what a later Congress would enact?), but because it is our role to make sense rather than nonsense out of the *corpus juris*. But where, as here, the meaning of the term prevents such accommodation, it is not our function to eliminate clearly expressed inconsistency of policy and to treat alike subjects that different Congresses have chosen to treat differently. The facile attribution of congressional "forgetfulness" cannot justify such a usurpation. Where what is at issue is not a contradictory disposition within the same enactment, but merely a difference between the more parsimonious policy of an earlier enactment and the more generous policy of a later one, there is no more basis for saying that the earlier Congress forgot than for saying that the earlier Congress felt differently. In such circumstances, the attribution of forgetfulness rests in reality upon the judge's assessment that the later statute contains the *better* disposition. But that is not for judges to prescribe. We thus reject this last argument for the same reason that Justice Brandeis, writing for the Court, once rejected a similar (though less explicit) argument by the United States:

> "[The statute's] language is plain and unambiguous. What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function." *Iselin* v. *United States*, 270 U. S. 245, 250–251 (1926).[7]

---

[7] WVUH at least asks us to guess the preferences of the *enacting* Congress. JUSTICE STEVENS apparently believes our role is to guess the desires of the *present* Congress, or of Congresses yet to be. "Only time will tell," he says, "whether the Court, with its literal reading of § 1988, has correctly interpreted the will of Congress," *post*, at 116. The implication is that today's holding will be proved wrong if Congress amends the law to conform with his dissent. We think not. The "will of Congress" we look to is not a will evolving from Session to Session, but a will expressed and fixed in a particular enactment. Otherwise, we would speak not of "interpreting" the law but of "intuiting" or "predicting" it. Our role is to say

* * *

For the foregoing reasons, we conclude that § 1988 conveys no authority to shift expert fees. When experts appear at trial, they are of course eligible for the fee provided by § 1920 and § 1821—which was allowed in the present case by the Court of Appeals.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE MARSHALL, dissenting.

As JUSTICE STEVENS demonstrates, the Court uses the implements of literalism to wound, rather than to minister to, congressional intent in this case. That is a dangerous usurpation of congressional power when any statute is involved. It is troubling for special reasons, however, when the statute at issue is clearly designed to give access to the federal courts to persons and groups attempting to vindicate vital civil rights. A District Judge has ably put the point in an analogous context:

> "At issue here is much more than the simple question of how much [plaintiff's] attorneys should receive as attorney fees. At issue is . . . continued full and vigorous commitment to this Nation's lofty, but as yet unfulfilled, agenda to make the promises of this land available to all citizens, without regard to race or sex or other impermissible characteristic. There are at least two ways to undermine this commitment. The first is open and direct: a repeal of this Nation's anti-discrimination laws. The second is more indirect and, for this reason, somewhat insidious: to deny victims of discrimination a means for redress by creating an economic market in which attorneys cannot afford to represent them and take their

what the law, as hitherto enacted, *is;* not to forecast what the law, as amended, *will be.*

cases to court." *Hidle* v. *Geneva County Bd. of Ed.*, 681 F. Supp. 752, 758–759 (MD Ala. 1988) (awarding attorney's fees and expenses under Title VII of the Civil Rights Act of 1964).

JUSTICE STEVENS, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Since the enactment of the Statute of Wills in 1540,[1] careful draftsmen have authorized executors to pay the just debts of the decedent, including the fees and expenses of the attorney for the estate. Although the omission of such an express authorization in a will might indicate that the testator had thought it unnecessary, or that he had overlooked the point, the omission would surely not indicate a deliberate decision by the testator to forbid any compensation to his attorney.

In the early 1970's, Congress began to focus on the importance of public interest litigation, and since that time, it has enacted numerous fee-shifting statutes. In many of these statutes, which the majority cites at length, see *ante*, at 88–92, Congress has expressly authorized the recovery of expert witness fees as part of the costs of litigation. The question in this case is whether, notwithstanding the omission of such an express authorization in 42 U. S. C. § 1988, Congress intended to authorize such recovery when it provided for "a reasonable attorney's fee as part of the costs." In my view, just as the omission of express authorization in a will does not preclude compensation to an estate's attorney, the omission of express authorization for expert witness fees in a fee-shifting provision should not preclude the award of expert witness fees. We should look at the way in which the Court has interpreted the text of *this statute* in the past, as well as *this statute*'s legislative history, to resolve the question before us, rather than looking at the text of the many other statutes that the majority cites in which Congress expressly recognized the need for compensating expert witnesses.

---

[1] 32 Hen. VIII, ch. 1 (1540).

I

Under either the broad view of "costs" typically assumed in the fee-shifting context or the broad view of "a reasonable attorney's fee" articulated by this Court, expert witness fees are a proper component of an award under § 1988. Because we are not interpreting these words for the first time, they should be evaluated in the context that this and other courts have already created.[2]

The term "costs" has a different and broader meaning in fee-shifting statutes than it has in the cost statutes that apply to ordinary litigation.[3] The cost bill in this case illustrates the point. Leaving aside the question of expert witness fees, the prevailing party sought reimbursement for $45,867 in disbursements, see App. to Pet. for Cert. C-1, which plainly would not have been recoverable costs under 28 U. S. C. § 1920.[4] These expenses, including such items as travel and long-distance telephone calls, were allowed by the District Court and were not even questioned by respondents. They were expenses that a retained lawyer would ordinarily bill to his or her client. They were accordingly considered proper "costs" in a case of this kind.

The broad construction typically given to "costs" in the fee-shifting context is highlighted by THE CHIEF JUSTICE's contrasting view in *Missouri* v. *Jenkins*, 491 U. S. 274 (1989), in which he argued that paralegal and law clerk fees could not even be awarded as "costs" under 28 U. S. C. § 1920. One of the issues in *Jenkins* was the *rate* at which the services of law clerks and paralegals should be compensated. The State contended that actual cost, rather than market value, should govern. It did not, however, even question the propriety of

---

[2] My view, as I have expressed in the past, is that we should follow Justice Cardozo's advice to the judge to "lay [his] own course of bricks on the secure foundation of the courses laid by others who had gone before him." B. Cardozo, The Nature of the Judicial Process 149 (1921).

[3] See, *e. g.*, 28 U. S. C. § 1920; see also Fed. Rule Civ. Proc. 54(d).

[4] Quoted in pertinent part, *ante*, at 86.

reimbursing the prevailing party for the work of these nonlawyers. Only THE CHIEF JUSTICE—in a lone dissent the reasoning of which is now endorsed by the Court—advanced a purely literal interpretation of the statute. He wrote:

> "I also disagree with the State's suggestion that law clerk and paralegal expenses incurred by a prevailing party, if not recoverable at market rates as 'attorney's fees' under § 1988, are nonetheless recoverable at actual cost under that statute. The language of § 1988 expands the traditional definition of 'costs' to include 'a reasonable attorney's fee,' but it cannot fairly be read to authorize the recovery of all other out-of-pocket expenses actually incurred by the prevailing party in the course of litigation. Absent specific statutory authorization for the recovery of such expenses, the prevailing party remains subject to the limitations on cost recovery imposed by Federal Rule of Civil Procedure 54(d) and 28 U. S. C. § 1920, which govern the taxation of costs in federal litigation where a cost-shifting statute is not applicable. Section 1920 gives the district court discretion to tax certain types of costs against the losing party in any federal litigation. The statute specifically enumerates six categories of expenses which may be taxed as costs: fees of the court clerk and marshal; fees of the court reporter; printing fees and witness fees; copying fees; certain docket fees; and fees of court-appointed experts and interpreters. We have held that this list is exclusive. *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S. 437 (1987). Since none of these categories can possibly be construed to include the fees of law clerks and paralegals, I would also hold that reimbursement for these expenses may not be separately awarded at actual cost." 491 U. S., at 297–298.

Although THE CHIEF JUSTICE argued that charges for the work of paralegals and law clerks were not part of the nar-

rowly defined "costs" that were reimbursable under § 1920, nor were they part of an "attorney's fee" reimbursable under § 1988, the Court did not reach THE CHIEF JUSTICE's point about costs because it held in *Jenkins* that such expenses were part of a "reasonable attorney's fee" authorized by § 1988, and thus could be reimbursed at market rate.   In the Court's view, a "reasonable attorney's fee" referred to "a reasonable fee for the work product of an attorney."   *Id.*, at 285.   We explained:

> "[T]he fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit. The parties have suggested no reason why the work of paralegals should not be similarly compensated, nor can we think of any.   We thus take as our starting point the self-evident proposition that the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals, as well as that of attorneys."   *Ibid.*

In *Jenkins*, the Court acknowledged that the use of paralegals instead of attorneys reduced the cost of litigation, and "'by reducing the spiraling cost of civil rights litigation, further[ed] the policies underlying civil rights statutes.'"   *Id.*, at 288.   If attorneys were forced to do the work that paralegals could just as easily perform under the supervision of an attorney, such as locating and interviewing witnesses or compiling statistical and financial data, then "it would not be surprising to see a greater amount of such work performed by attorneys themselves, thus increasing the overall cost of litigation."   *Id.*, at 288, n. 10.

This reasoning applies equally to other forms of specialized litigation support that a trial lawyer needs and that the client customarily pays for, either directly or indirectly.   Although reliance on paralegals is a more recent development than the use of traditional expert witnesses, both paralegals and ex-

pert witnesses perform important tasks that save lawyers' time and enhance the quality of their work product. In this case, it is undisputed that the District Court correctly found that the expert witnesses were "essential" and "necessary" to the successful prosecution of the plaintiff's case,[5] and that their data and analysis played a pivotal role in the attorney's trial preparation.[6] Had the attorneys attempted to perform the tasks that the experts performed, it obviously would have taken them far longer than the experts and the entire case would have been far more costly to the parties. As Judge Posner observed in a comparable case:

> "The time so spent by the expert is a substitute for lawyer time, just as paralegal time is, for if prohibited (or deterred by the cost) from hiring an expert the lawyer would attempt to educate himself about the expert's area of expertise. To forbid the shifting of the expert's fee would encourage underspecialization and inefficient trial preparation, just as to forbid shifting the cost of paralegals would encourage lawyers to do paralegals' work. There is thus no basis for distinguishing *Jenkins* from the present case so far as time spent by these experts in educating the plaintiffs' lawyer is concerned . . . ." *Friedrich* v. *Chicago*, 888 F. 2d 511, 514 (CA7 1989).

In *Jenkins*, we interpreted the award of "a reasonable *attorney's* fee" to cover charges for paralegals and law clerks, even though a paralegal or law clerk is not an attorney. Similarly, the federal courts routinely allow an attorney's travel expenses or long-distance telephone calls to be awarded, even though they are not literally part of an "attorney's *fee*," or part of "costs" as defined by 28 U. S. C. § 1920. To allow reimbursement of these other categories of expenses, and yet not to include expert witness fees, is both

---

[5] App. to Pet. for Cert. C–2; App. 117.

[6] The expert witnesses here played a pivotal role in their nontestimonial, rather than simply their testimonial, capacity. See Pet. for Cert. 6–7; App. 120–139.

arbitrary and contrary to the broad remedial purpose that inspired the fee-shifting provision of § 1988.

## II

The Senate Report on the Civil Rights Attorney's Fees Awards Act of 1976 explained that the purpose of the proposed amendment to 42 U. S. C. § 1988 was "to remedy anomalous gaps in our civil rights laws created by the United States Supreme Court's recent decision in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975), and to achieve consistency in our civil rights laws."[7] S. Rep. No. 94–1011, p. 1 (1976). The Senate Committee on the Judiciary wanted to level the playing field so that private citizens, who might have little or no money, could still serve as "private attorneys general" and afford to bring actions, even against state or local bodies, to enforce the civil rights laws. The Committee acknowledged that "[i]f private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover *what it costs them* to vindicate these rights in court." *Id.*, at 2 (emphasis added). According to the Committee, the bill would create "no startling new remedy," but would simply provide "the technical requirements" requested by the Supreme Court in *Alyeska*, so that courts could "continue the practice of awarding attorneys' fees which had been going on for years prior to the Court's May decision." *Id.*, at 6.

---

[7] In *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975), the Court held that courts were not free to fashion new exceptions to the American Rule, according to which each side assumed the cost of its own attorney's fees. The Court reasoned that it was not the Judiciary's role "to invade the legislature's province by redistributing litigation costs . . . ," *id.*, at 271, and that it would be "inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation . . . ." *Id.*, at 247.

To underscore its intention to return the courts to their pre-*Alyeska* practice of shifting fees in civil rights cases, the Senate Committee's Report cited with approval not only several cases in which fees had been shifted, but also all of the cases contained in Legal Fees, Hearings before the Subcommittee on Representation of Citizen Interests of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., pt. 3, pp. 888–1024, 1060–1062 (1973) (hereinafter Senate Hearings). See S. Rep. No. 94–1011, at 4, n. 3. The cases collected in the 1973 Senate Hearings included many in which courts had permitted the shifting of costs, including expert witness fees. At the time when the Committee referred to these cases, though several were later reversed, it used them to make the point that prior to *Alyeska*, courts awarded attorney's fees and costs, including expert witness fees, in civil rights cases, and that they did so in order to encourage private citizens to bring such suits.[8] It was to this pre-*Alyeska* regime, in which courts could award expert witness fees along with attorney's fees, that the Senate Committee intended to return through the passage of the fee-shifting amendment to § 1988.

---

[8] See, *e. g.*, *Beens* v. *Erdahl*, 349 F. Supp. 97, 100 (Minn. 1972); *Bradley* v. *School Board of Richmond*, 53 F. R. D. 28, 44 (ED Va. 1971) ("Fees for expert witnesses' testimony likewise will be allowed as an expense of suit. It is difficult to imagine a more necessary item of proof (and source of assistance to the Court) than the considered opinion of an educational expert"), rev'd, 472 F. 2d 318 (CA4 1972), vacated, 416 U. S. 696 (1974); *La Raza Unida* v. *Volpe*, No. 71–1166 (ND Cal., Oct. 19, 1972), reprinted in Senate Hearings, pt. 3, pp. 1060, 1062 (expert witness fees allowed because experts' testimony was "helpful to the court"); *Pyramid Lake Paiute Tribe of Indians* v. *Morton*, 360 F. Supp. 669, 672 (DC 1973) ("The plaintiff's experts played a vital role in the resolution of the case, their work and testimony going to the heart of the matter. Accordingly, it seems entirely appropriate to award their fees as scheduled in the total amount of $20,488.72 . . ."), rev'd, 163 U. S. App. D. C. 90, 499 F. 2d 1095 (1974), cert. denied, 420 U. S. 962 (1975).

The House Report expressed concerns similar to those raised by the Senate Report. It noted that "[t]he effective enforcement of Federal civil rights statutes depends largely on the efforts of private citizens" and that the House bill was "designed to give such persons effective access to the judicial process . . . ." H. R. Rep. No. 94–1558, p. 1 (1976). The House Committee on the Judiciary concluded that "civil rights litigants were suffering very severe hardships because of the *Alyeska* decision," and that the case had had a "devastating impact" and had created a "compelling need" for a fee-shifting provision in the civil rights context. *Id.*, at 2–3.

According to both Reports, the record of House and Senate subcommittee hearings, consisting of the testimony and written submissions of public officials, scholars, practicing attorneys, and private citizens, and the questions of the legislators, makes clear that both committees were concerned with preserving access to the courts and encouraging public interest litigation.[9]

---

[9] A frequently expressed concern was the need to undo the damage to public interest litigation caused by *Alyeska*. See, *e. g.*, Awarding of Attorneys' Fees, Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 94th Cong., 1st Sess., 2, 41, 42, 43, 54, 82–85, 87, 90–92, 94, 103, 119–121, 123–125, 134, 150, 153–155, 162, 182–183, 269, 272–273, 370, 378–395, 416–418 (1975) (hereinafter House Hearings). Many who testified expressed the view that attorneys needed fee-shifting provisions so that they could afford to work on public interest litigation, see, *e. g.*, *id.*, at 66–67, 76, 78–79, 80, 89, 124–125, 137–142, 146, 158–159, 276–277, 278–280, 306–308; see also *id.*, at 316–326; Senate Hearings, pt. 3, pp. 789–790, 855–857, 1115, and private citizens needed fee-shifting provisions so that they could be made whole again, see, *e. g.*, House Hearings, pp. 60, 189, 192, 254–255, 292, 328; see also *id.*, at 106–111, 343–345, 347–349. For example, the private citizen who was brought into court by the Government and who later prevailed would still not be made whole, because he had to bear the costs of his own attorney's fees. The Senate Hearings also examined the average citizen's lack of access to the legal system. See, *e. g.*, Senate Hearings, pts. 1, 2, pp. 1–2, 3–4, 273 (addressing question whether coal miners were receiving adequate legal coverage); *id.*, pt. 2, at 466, 470–471, 505–509, 515 (addressing question whether veterans were denied

It is fair to say that throughout the course of the hearings, a recurring theme was the desire to return to the pre-*Alyeska* practice in which courts could shift fees, including expert witness fees, and make those who acted as private attorneys general whole again, thus encouraging the enforcement of the civil rights laws.

The case before us today is precisely the type of public interest litigation that Congress intended to encourage by amending § 1988 to provide for fee shifting of a "reasonable attorney's fee as part of the costs." Petitioner, a tertiary medical center in West Virginia near the Pennsylvania border,[10] provides services to a large number of Medicaid recipients throughout Pennsylvania. In January 1986, when the Pennsylvania Department of Public Welfare notified petitioner of its new Medicaid payment rates for Pennsylvania Medicaid recipients, petitioner believed them to be below the minimum standards for reimbursement specified by the Social Security Act. Petitioner successfully challenged the adequacy of the State's payment system under 42 U. S. C. § 1983.

This Court's determination today that petitioner must assume the cost of $104,133 in expert witness fees is at war with the congressional purpose of making the prevailing party whole. As we said in *Hensley* v. *Eckerhart*, 461 U. S. 424, 435 (1983), petitioner's recovery should be "fully compensatory," or, as we expressed in *Jenkins*, petitioner's recovery should be "comparable to what 'is traditional with attorneys compensated by a fee-paying client.' S. Rep. No. 94–1011, p. 6 (1976)." 491 U. S., at 286.

---

legal assistance by $10 contingent fee); *id.*, pt. 3, at 789, 791–796, 808–810 (Indians' access to lawyers); *id.*, pt. 3, at 1127, 1253–1254 (average citizen cannot afford attorney).

[10] A "tertiary" hospital provides a level of medical services that is generally complex and not provided by community hospitals. Brief for Petitioner 3, n. 1.

## III

In recent years the Court has vacillated between a purely literal approach to the task of statutory interpretation and an approach that seeks guidance from historical context, legislative history, and prior cases identifying the purpose that motivated the legislation. Thus, for example, in *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412 (1978), we rejected a "mechanical construction," *id.*, at 418, of the fee-shifting provision in § 706(k) of Title VII of the Civil Rights Act of 1964 that the prevailing defendant had urged upon us. Although the text of the statute drew no distinction between different kinds of "prevailing parties," we held that awards to prevailing plaintiffs are governed by a more liberal standard than awards to prevailing defendants. That holding rested entirely on our evaluation of the relevant congressional policy and found no support within the four corners of the statutory text. Nevertheless, the holding was unanimous and, to the best of my knowledge, evoked no adverse criticism or response in Congress.[11]

---

[11] Other examples of cases in which the Court eschewed the literal approach include *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), and *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616 (1987). Although the dissenters had the better textual argument in both cases, and urged the Court to read the words of the statute literally, the Court, in both cases, opted for a reading that took into account congressional purpose and historical context. See *Steelworkers* v. *Weber*, 443 U. S., at 201 (Court rejected "literal construction of §§ 703(a) and (d)" and held that the statute must "be read against the background of the legislative history of Title VII and the historical context from which the Act arose"); *Johnson* v. *Transportation Agency*, 480 U. S., at 627 (legality of employer's affirmative-action plan to be assessed according to criteria announced in *Weber*). Neither decision prompted an adverse congressional response.

Although there have been those who have argued that congressional inaction cannot be seen as an endorsement of this Court's interpretations, see, *e. g.*, *Johnson* v. *Transportation Agency*, 480 U. S., at 671–672 (SCALIA, J., dissenting); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 175, n. 1 (1989), that charge has been answered by the observation

On those occasions, however, when the Court has put on its thick grammarian's spectacles and ignored the available evidence of congressional purpose and the teaching of prior cases construing a statute, the congressional response has been dramatically different. It is no coincidence that the Court's literal reading of Title VII, which led to the conclusion that disparate treatment of pregnant and nonpregnant persons was not discrimination on the basis of sex, see *General Electric Co.* v. *Gilbert,* 429 U. S. 125 (1976), was repudiated by the 95th Congress;[12] that its literal reading of the "continuous physical presence" requirement in § 244(a)(1) of the Immigration and Nationality Act, which led to the view that the statute did not permit even temporary or inadvertent absences from this country, see *INS* v. *Phinpathya,* 464 U. S. 183 (1984), was rebuffed by the 99th Congress;[13] that its literal reading of the word "program" in Title IX of the

---

that "when Congress has been displeased with [the Court's] interpretation . . . , it has not hesitated to amend the statute to tell us so. . . . Surely, it is appropriate to find some probative value in such radically different congressional reactions to this Court's interpretations . . . ." *Johnson* v. *Transportation Agency,* 480 U. S., at 629–630, n. 7; see *Patterson* v. *McLean Credit Union,* 491 U. S., at 200 (Brennan, J., concurring in judgment in part and dissenting in part) ("Where our prior interpretation of congressional intent was plausible, . . . we have often taken Congress' subsequent inaction as probative to varying degrees, depending upon the circumstances, of its acquiescence"). Since Congress has had an opportunity, albeit brief, to correct our broad reading of attorney's fees in *Jenkins* if it thought that we had misapprehended its purpose, the Court has no reason to change its approach to the fee-shifting provision of § 1988, as the majority does today.

[12] See Pregnancy Discrimination Act of 1978, Pub. L. 95–555, 92 Stat. 2076, 42 U. S. C. § 2000e(k) (overturning *General Electric Co.* v. *Gilbert,* 429 U. S. 125 (1976)).

[13] Immigration Reform and Control Act of 1986, Pub. L. 99–603, § 315(b), 100 Stat. 3440 ("An alien shall not be considered to have failed to maintain continuous physical presence in the United States . . . if the absence from the United States was brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence").

Education Amendments of 1972, which led to the Court's gratuitous limit on the scope of the antidiscrimination provisions of Title IX,[14] see *Grove City College* v. *Bell,* 465 U. S. 555 (1984), was rejected by the 100th Congress;[15] or that its refusal to accept the teaching of earlier decisions in *Wards Cove Packing Co.* v. *Atonio,* 490 U. S. 642 (1989) (reformulating order of proof and weight of parties' burdens in disparate-impact cases), and *Patterson* v. *McLean Credit Union,* 491 U. S. 164 (1989) (limiting scope of 42 U. S. C. § 1981 to the making and enforcement of contracts), was overwhelmingly rejected by the 101st Congress,[16] and its refusal to accept the widely held view of lower courts about the scope of fraud, see *McNally* v. *United States,* 483 U. S. 350 (1987) (limiting mail

---

[14] See *Grove City College* v. *Bell,* 465 U. S., at 579 (STEVENS, J., concurring in part and concurring in result) (Court should refrain from deciding issue not in dispute).

[15] See Civil Rights Restoration Act of 1987, Pub. L. 100–259, 102 Stat. 28, 20 U. S. C. § 1687.  Congress was clear in expressing the need for the subsequent legislation:

"Congress finds that—

"(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972 . . . ; and

"(2) legislative action is necessary to restore prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered."  20 U. S. C. § 1687 note.

[16] See H. R. Conf. Rep. No. 101–856, p. 1 (1990) (Civil Rights Act of 1990).  Again, Congress was blunt about its purposes:

"The purposes of this Act are to—

"(1) respond to the Supreme Court's recent decisions by restoring the civil rights protections that were dramatically limited by those decisions; and

"(2) strengthen existing protections and remedies available under Federal civil rights laws to provide more effective deterrence and adequate compensation for victims of discrimination."  *Id.,* at 1–2.

The fact that the President vetoed the legislation does not undermine the conclusion that Congress viewed the Court's decisions as incorrect interpretations of the relevant statutes.

fraud to protection of property), was quickly corrected by the 100th Congress.[17]

In the domain of statutory interpretation, Congress is the master. It obviously has the power to correct our mistakes, but we do the country a disservice when we needlessly ignore persuasive evidence of Congress' actual purpose and require it "to take the time to revisit the matter"[18] and to restate its purpose in more precise English whenever its work product suffers from an omission or inadvertent error. As Judge Learned Hand explained, statutes are likely to be imprecise.

> "All [legislators] have done is to write down certain words which they mean to apply generally to situations of that kind. To apply these literally may either pervert what was plainly their general meaning, or leave undisposed of what there is every reason to suppose they meant to provide for. Thus it is not enough for the judge just to use a dictionary. If he should do no more, he might come out with a result which every sensible man would recognize to be quite the opposite of what was really intended; which would contradict or leave unfulfilled its plain purpose." L. Hand, How Far Is a Judge Free in Rendering a Decision?, in The Spirit of Liberty 103, 106 (I. Dilliard ed. 1952).

The Court concludes its opinion with the suggestion that disagreement with its textual analysis could only be based on the dissenters' preference for a "better" statute, *ante*, at 101. It overlooks the possibility that a different view may be more faithful to Congress' command. The fact that Congress has consistently provided for the inclusion of expert witness fees in fee-shifting statutes when it considered the matter is a weak reed on which to rest the conclusion that the omission of

---

[17] See Pub. L. 100–690, § 7603, 102 Stat. 4508, 18 U. S. C. § 1346 ("[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services").

[18] *Smith* v. *Robinson*, 468 U. S. 992, 1031 (1984) (Brennan, J., dissenting).

116

such a provision represents a deliberate decision to forbid such awards.    Only time will tell whether the Court, with its literal reading [19] of § 1988, has correctly interpreted the will of Congress with respect to the issue it has resolved today.

I respectfully dissent.

---

[19] Seventy years ago, Justice Cardozo warned of the dangers of literal reading, whether of precedents or statutes:

"[Some judges'] notion of their duty is to match the colors of the case at hand against the colors of many sample cases spread out upon their desk. The sample nearest in shade supplies the applicable rule.    But, of course, no system of living law can be evolved by such a process, and no judge of a high court, worthy of his office, views the function of his place so narrowly. If that were all there was to our calling, there would be little of intellectual interest about it.    The man who had the best card index of the cases would also be the wisest judge.    It is when the colors do not match, when the references in the index fail, when there is no decisive precedent, that the serious business of the judge begins."    The Nature of the Judicial Process, at 20–21.