**Hector RIVERA, Plaintiff,**

**v.**

**Benjamin DYETT, M.D., Medical Director of the Sing Sing Correctional Facility, Thomas Coughlin, III, Commissioner, New York State Department of Correctional Services, Robert Jacques, M.D., Chief of the Psychiatric Satellite Unit of the New York State Office of Mental Health at the Sing Sing Correctional Facility, Richard Surles, Commissioner** of the New York State Office of Mental Health, and Frank Sandor, M.D., of the New York State Department of Correctional Services, all in their individual and representative capacities, Defendants.

No. 88 Civ. 4707 (PKL).

United States District Court, S.D. New York.

April 29, 1991.

1110

Loren I. Glassman, Carol Kahn, White Plains, N.Y., for plaintiff.

Robert Abrams, Atty. Gen., New York City (Michael A. Rosas, of counsel), for defendants.

## ORDER AND OPINION

LEISURE, District Judge:

This is a civil rights action brought pursuant to 42 U.S.C. § 1983, arising from the conditions of plaintiff's incarceration at the Sing Sing Correctional Facility ("Sing Sing"). Plaintiff's complaint seeks declaratory, compensatory and injunctive relief. Plaintiff's counsel now move for an order granting an award of interim attorney's fees in the amount of $44,120, pursuant to 42 U.S.C. § 1988, on the ground that plaintiff was a "prevailing party" with respect to certain preliminary relief plaintiff sought.

## BACKGROUND

Plaintiff has been incarcerated at numerous New York State Department of Correctional Services facilities since 1972, and is presently serving a 25–year-to-life sentence for murder. Plaintiff is a diabetic who also suffers from serious psychiatric disorders, and has attempted suicide on at least two occasions. As a result of complications from plaintiff's diabetes, the lower portions of both of plaintiff's legs have been amputated.

In May 1987, plaintiff was transferred from Green Haven Correctional Facility ("Green Haven") to Sing Sing. In a transfer memorandum, the Green Haven medical staff informed the medical staff at Sing Sing that plaintiff had a "chronic history of non-compliance with medication, insulin, diet, lab-work and treatments." Affidavit of Frank Sandor, M.D., sworn to on July 14, 1988 ("Sandor Aff."), Exhibit A, attached as Exhibit 2 to Affidavit of Michael A. Rosas, Esq., sworn to on March 1, 1991 ("Rosas Aff."). From the time of his transfer to Sing Sing until April 22, 1988, plaintiff was generally housed at the Sing Sing infirmary. During this period, plaintiff was hospitalized on several occasions for treatment of diabetes-related infections, including the amputation of plaintiff's left

leg below the knee in February 1988. Sandor Aff., ¶ 3.

On April 22, 1988, plaintiff was discharged from the Sing Sing infirmary. Plaintiff's medical records indicate that plaintiff repeatedly refused to go to the emergency room for insulin injections in late April 1988, that on May 2 arrangements were made for plaintiff's admission to St. Claire's Hospital so that he could undergo a sympathectomy, that plaintiff refused the operation and was discharged back to the Sing Sing infirmary on May 11, 1988. Sandor Aff., ¶¶ 7, 8 and Exhibit C. On May 11, 1988, plaintiff refused to allow a Sing Sing staff physician to examine his right big toe. Plaintiff was discharged from the infirmary and given daily insulin injections on May 12 and 13. Sandor Aff., ¶ 9. On May 14, 1988, a Sing Sing physician's assistant examined plaintiff's right big toe and noticed some "disturbed" skin. Betadine soaks were ordered, however plaintiff became loud, demanded an increase in his pain medication, refused his insulin and other medication and left the infirmary. Sandor Aff., ¶ 10.

From May 15 to May 18, 1988, plaintiff accepted insulin injections. On May 18 the physician's assistant noticed that the condition of plaintiff's right big toe had worsened. Antibiotics and betadine soaks were ordered, both of which plaintiff had been refusing. Sandor Aff., ¶ 11. On May 19 a purulent discharge was noticed from plaintiff's right toe. An attempt was made to admit plaintiff to St. Claire's Hospital, but St. Claire's declined, stating that no beds were available. On May 20, Dr. Sandor, who was a primary care physician for plaintiff during his confinement at Sing Sing, arranged for plaintiff's admission to Butterfield Hospital, where plaintiff remained for almost three weeks. Sandor Aff., ¶ 12. On June 9, 1988, however, plaintiff signed out of Butterfield Hospital, against the advice of the attending physician and the hospital authorities, and was admitted to the Sing Sing infirmary. He was examined by Dr. Sandor, who discharged him from the infirmary on June 10, with instructions that plaintiff be housed so he could come to

the infirmary by wheelchair. Sandor Aff., ¶ 13.

Plaintiff received insulin injections on June 10, 11 and 12, 1988. On the afternoon of June 13, plaintiff suffered a "seizure" because his sugar level was low. He was admitted to the infirmary and given sugar and orange juice, and his condition improved. On June 14, 1988, Dr. Sandor again examined plaintiff and discharged him from the infirmary, with orders for daily sugar level testing. Sandor Aff., ¶ 14. Over the following two weeks, plaintiff received regular insulin injections. Twice plaintiff failed to appear for sick call, but on June 28, 1988, plaintiff came to the emergency room, where a physician's assistant examined him and noticed dead tissue surrounding ulcers on his right big toe. Betadine soaks were again ordered, as was a surgical evaluation. On June 30, 1988, plaintiff reported that he was becoming dizzy in the evenings, and an adjustment was made in the timing of plaintiff's sugar level testing. Sandor Aff., ¶ 15. On July 6 and 7, 1988, plaintiff's right foot was again examined, and betadine soaks were continued. Sandor Aff., ¶ 16. On July 13, 1988, plaintiff was transferred to Auburn Correctional Facility ("Auburn"). According to Dr. Sandor, throughout plaintiff's confinement at Sing Sing plaintiff was "extremely uncooperative with and overtly hostile to medical staff ... [and] refused to accept recommended treatment on many occasions and thus impaired our efforts to attend to his serious medical needs." Sandor Aff., ¶ 6. Dr. Sandor's final diagnosis of plaintiff stated that plaintiff's condition "may call for hospitalization and may eventually require amputation. In my judgment, however, immediate hospitalization is not necessary. Local wound care and antibiotics are adequate pending the surgical evaluation."

On July 7, 1988, before his transfer to Auburn, plaintiff commenced this action. On July 8, 1988, plaintiff moved, by order to show cause, for a preliminary injunction

directing Defendants to immediately admit [plaintiff] to a hospital and provide Plaintiff's entire medical and psychiatric charts to said hospital with direction to

perform an emergency diabetic work-up to control his diabetes, control the bone infection in his right foot, and stabilize his medication ... [and] provide Plaintiff with a diabetic diet approved by the American Diabetic Association ... proper access within a [Department of Correctional Services] institution to medical and psychiatric care and medication, and use of sanitary shower facilities with a grip bar.

Order to Show Cause, July 8, 1988.

Upon plaintiff's arrival at Auburn, he was placed in the infirmary and examined by Dr. Roger D. Spier, M.D. ("Spier"), who performed an evaluation on July 13, 1988, and again on July 20, 1988. Affidavit of Roger D. Spier, M.D., sworn to on July 22, 1988 ("Spier Aff."), attached as Exhibit 3 to Rosas Aff. Rivera was placed on a diet approved by the American Diabetic Association. Spier Aff., ¶ 4. Spier concluded on July 22, 1988 that "oral antibiotics should be sufficient to deal with [plaintiff's] condition," and that "intravenous antibiotics and debridement are not necessary at this point. Therefore, immediate hospitalization is not appropriate." Spier Aff., ¶¶ 5, 6. Spier also noted that plaintiff "was extremely uncooperative with medical staff and disruptive of the functioning of the infirmary. Mr. Rivera failed to follow instructions of medical staff and refused insulin injections. Subsequently, Mr. Rivera became less hostile and began accepting the treatment offered. However, he continues to refuse to stop smoking cigarettes, which impairs his circulation." Spier Aff., ¶ 3.

On August 1, 1988, this Court "so ordered" a stipulation signed by the parties (the "Stipulation"), providing that:

IT IS HEREBY STIPULATED AND AGREED, pursuant to F.R.C.P. 35, that as soon as practically possible Defendants shall cause Plaintiff to be medically evaluated by physicians not employed by the New York State Department of Correctional Services. The evaluations shall include (a) bone scans of the Plaintiff's right toes and foot; (b) evaluations by physicians to determine the Plaintiff's need for surgical debridement of areas on his right toes and foot; (c) evaluations by a diabetologist; and it is further

STIPULATED AND AGREED, that upon a finding by the physicians and other medical personnel that Plaintiff requires hospitalization that Defendants shall take all necessary steps to assure that Plaintiff is immediately hospitalized in a facility able to meet Plaintiff's medical care needs; and it is further

STIPULATED AND AGREED, that Defendants shall not take any steps to remove Plaintiff from any hospital unless Plaintiff is discharged by the hospital's medical staff or unless this court orders Plaintiff's release.

Stipulation and Order, August 1, 1988. Plaintiff had already been admitted to University Hospital on or about July 27, 1988, and was examined by Dr. Carl Bredenberg ("Dr. Bredenberg"). Affidavit of Loren I. Glassman, Esq., sworn to on January 11, 1991 ("Glassman Aff."), ¶ 8; Rosas Aff., ¶ 9. Dr. Bredenberg's report concluded that plaintiff "will need elective admission for good wound care," and "may need amputation of the right great toe." Rosas Aff., Exhibit 5. Dr. Bredenberg's report did not indicate that immediate hospitalization or amputation were necessary. Plaintiff was released from University Hospital on August 4, 1988, and returned to Auburn. Although the evidence before the Court is very thin on this point, it appears that plaintiff was readmitted to University Hospital on August 5, 1988, and had his right big toe amputated on August 11, 1988. Glassman Aff., ¶ 8; Plaintiff's Reply Memorandum of Law at 8.

## DISCUSSION

Section 1988 of Title 42 provides, in relevant part, that "[i]n any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." The method most commonly used to determine a reasonable fee is the "lodestar" method, which looks to "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."

*Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The fee thus calculated may, however, be reduced if the prevailing party gained only limited or partial success on his or her claims, *see Texas State Teachers Association v. Garland Independent School District,* 489 U.S. 782, 789–90, 109 S.Ct. 1486, 1491–92, 103 L.Ed.2d 866 (1989); *Hensley, supra,* 461 U.S. at 436–37, 103 S.Ct. at 1941–42; *Ruggiero v. Krzeminski,* 928 F.2d 558, 564 (2d Cir.1991), or if inadequate documentation of the attorney's work is provided. *See Hensley, supra,* 461 U.S. at 433, 103 S.Ct. at 1939. "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941.

Plaintiff's counsel, Loren I. Glassman, Esq. ("Glassman") and Carol Kahn, Esq. ("Kahn"), who work together in a single office, seek a total of $44,120 for the legal services they provided plaintiff in conjunction with plaintiff's motion for a preliminary injunction. Specifically, Glassman seeks $16,370 for 81.85 hours at $200 per hour, and Kahn seeks $17,750 for 88.75 hours at $200 per hour. Kahn also seeks $10,000 for expert fees paid to Dr. Janine Kelly. Defendants argue that plaintiff was not a "prevailing party" on any of the issues he raised in his motion for a preliminary injunction, and that even if he did prevail, the fee award should be significantly reduced due to failure to provide the evidence required to support the award.

### I. Extent of Plaintiff's Success

■ "In order to be eligible for attorney's fees under § 1988, a litigant must be a 'prevailing party.'" *Hewitt v. Helms,* 482 U.S. 755, 759, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987). However, it is important to recognize that "[t]he fact that [the plaintiff] prevailed through a settlement rather than through litigation does not weaken [his or] her claim to fees. Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights

have been violated." *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980).

■ The Supreme Court has explained that "[a] prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Texas Teachers Association, supra,* 489 U.S. at 791, 109 S.Ct. at 1493. A plaintiff may be a "prevailing party" within the meaning of § 1988 even if he or she does not prevail on all of the issues litigated. *See Texas Teachers Association, supra,* 489 U.S. at 790, 109 S.Ct. at 1492 (quoting S.Rep. No. 94–1011, p. 5 (1976)). However, "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." *Hensley, supra,* 461 U.S. at 440, 103 S.Ct. at 1943. Where, as in the case at bar, the plaintiff's claims "arise out of a common core or facts, and involve related legal theories," the Supreme Court has instructed that the district courts "should exercise their equitable discretion ... to arrive at a reasonable fee award, either by attempting to identify specific hours that should be eliminated or by simply reducing the award to account for the limited success of the plaintiff." *Texas Teachers Association, supra,* 489 U.S. at 789–90, 109 S.Ct. at 1491–92 (citing *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941).

The Court must thus first determine the extent of plaintiff's success in obtaining the relief sought in his motion for a preliminary injunction. The first element of relief plaintiff sought was an order "directing Defendants to immediately admit [plaintiff] to a hospital and provide Plaintiff's entire medical and psychiatric charts to said hospital with direction to perform an emergency diabetic work-up to control his diabetes, control the bone infection in his right foot, and stabilize his medication." Order to Show Cause, July 8, 1988. Plaintiff argues that he prevailed on this claim by virtue of the Stipulation's provision that plaintiff be medically evaluated at a hospital, and hospitalized if the examining physi-

cians deem it necessary. Defendants point out that the Stipulation was made pursuant to Rule 35, which is merely a discovery device used in cases where a party's mental or physical condition is in controversy, Fed. R.Civ.P. 35, and that to the extent plaintiff prevailed he did so merely on a procedural point.

■ The Court believes that the second and third paragraphs of the Stipulation go beyond the scope of Rule 35 discovery. Nevertheless, the Court must compare what plaintiff sought with what he actually obtained *as a result of his lawsuit.* As the Second Circuit has emphasized, "[t]he mere fact that a plaintiff may be reassured as a result of his lawsuit would not make him a prevailing party. We see no indication that Congress intended that fees be awarded to a plaintiff ... who obtained only benefits that the defendant plainly would have conferred even in the absence of a lawsuit." *Gingras v. Lloyd,* 740 F.2d 210, 213 (2d Cir.1984).

■ In the instant case, plaintiff sought admission to a hospital with a direction that certain emergency medical treatment be provided. The first paragraph of the Stipulation merely provides, however, that plaintiff be medically evaluated, pursuant to Rule 35. "That is not the stuff of which legal victories are made." *Hewitt, supra,* 482 U.S. at 760, 107 S.Ct. at 2675.[1] The second paragraph of the Stipulation provides that plaintiff be hospitalized if the evaluating physicians deemed it necessary. Yet there is no evidence that those physi-

cians made any such finding. Indeed, Dr. Bredenberg's report indicates only that plaintiff "will need elective admission for good wound care," and "may need amputation of the right great toe." Rosas Aff., Exhibit 5. Apparently plaintiff was released from University Hospital and returned to Auburn. Plaintiff was thereafter readmitted to University Hospital, where his right big toe was amputated six days later.

Critically, there is no evidence that the actual *treatment* plaintiff received for his condition following the commencement of his lawsuit, including following the signing of the Stipulation, was different in any material way from the treatment he was previously receiving and would have received in any event.[2] As detailed above, the evidence before the Court shows constant and considerable efforts on the part of defendants to treat plaintiff's condition, in spite of his frequent refusal of treatment and generally hostile and uncooperative behavior toward those attempting to help him. The fact that while at University Hospital plaintiff received intravenous instead of oral antibiotics, and had his wounds debrided, does not constitute the "material alteration of the legal relationship of the parties" that is the "touchstone of the prevailing party inquiry." *Texas Teachers Association, supra,* 489 U.S. at 792–93, 109 S.Ct. at 1493–94. Indeed, the need for such treatment may just as well have arisen between the time plaintiff was examined by Dr. Spier and his admission to University Hospital.[3] Plaintiff cannot

---

**1.** In fact, to the extent such an evaluation found that plaintiff had been receiving adequate and proper medical care, the Stipulation's first paragraph could be considered a "victory" for defendants.

**2.** Likewise, with respect to the Stipulation's third paragraph, there is no evidence that defendants had in the past attempted to remove plaintiff from any hospital. On the contrary, plaintiff repeatedly discharged himself against medical advice, or refused to be admitted in the first place. In addition, there is no evidence that defendants provided University Hospital with plaintiff's "entire medical and psychiatric charts," as was sought by the preliminary injunction.

**3.** This conclusion is not altered by the statements of Dr. Janine Kelly in her affidavit, sworn to on July 12, 1988 ("Kelly Affidavit"). Dr. Kelly was hired by plaintiff's counsel as an expert, and conducted a single two-hour examination of plaintiff on July 12, 1988. The Kelly Affidavit, which was not included—either in fact or by incorporation—in the instant moving papers, includes a number of conclusions that appear to ignore the effect of plaintiff's obstruction of his medical treatment. Dr. Kelly does state that plaintiff should receive immediate intravenous antibiotics and debridement of his ulcers. Kelly Affidavit ¶¶ 9, 11. To the extent this conclusion differs from the conclusions of Dr. Sandor and Dr. Spier, the Court believes this is a matter of medical judgment and debate that the Court is unable to resolve on the basis of the

transform himself into a "prevailing party" within the scope of § 1988 by bringing a suit for medical treatment, while at the same time rejecting the medical treatment that was offered to him, so that he eventually required additional treatment that he was subsequently given. Accordingly, plaintiff did not "prevail" on his medical treatment claim so as to merit an award of attorney's fees.

■■■■ The second element of relief plaintiff sought was an order directing defendants to "provide Plaintiff with a diabetic diet approved by the American Diabetic Association." Order to Show Cause, July 8, 1988. Plaintiff argues that Sing Sing's enactment of a diabetic diet in August 1988 qualifies him as a "prevailing party" on this issue. However, plaintiff was transferred from Sing Sing to Auburn in July 1988, and thus never benefited from the change. Relief that does not benefit the plaintiff personally does not render him a prevailing party. *See Rhodes v. Stewart*, 488 U.S. 1, 4, 109 S.Ct. 202, 203, 102 L.Ed.2d 1 (1988); *Hewitt, supra*, 482 U.S. at 763–64, 107 S.Ct. at 2677–78. Yet plaintiff's transfer to Auburn, where a diabetic diet approved by the American Diabetic Association was in place and was provided to plaintiff, did afford him the relief he sought. No such diet existed at Sing Sing, and the Court believes that the provision of such a diet was a material change that directly benefited plaintiff. Therefore, the Court finds that plaintiff was a "prevailing party" with respect to his claim for a diabetic diet, and thus attorney's fees should be awarded in that regard.

■■■■ The third element of relief sought by plaintiff was proper access to psychiatric care. The Court must decline a finding of "prevailing party" status on this issue due to a failure by plaintiff's counsel to provide any evidence that such care was lacking before this litigation began, or that

it was in fact provided as a result of this litigation. *See Hensley, supra*, 461 U.S. at 433, 103 S.Ct. at 1939 (fee applicant bears the burden of establishing entitlement to an award). Defendants assert that plaintiff was given psychiatric treatment during his confinement at Sing Sing. Rosas Aff., ¶ 16. Plaintiff's counsel claim that as a result of their actions plaintiff was psychiatrically evaluated, and prescribed psychiatric treatment. Glassman Aff., ¶ 12. Yet in support of this claim, plaintiff's counsel point only to a letter written by Kahn to prison officials requesting certain medical and psychiatric treatment, and an internal memorandum in which two of the defendants are instructed by Deputy Superintendent of Administration Joseph David to "[p]lease get together and evaluate this man." Glassman Aff., Exhibits A and B. The letter and memorandum are dated June 13, 1988 and June 23, 1988, respectively, both *before this action was commenced*. There is no evidence as to what kind of evaluation the memorandum refers to, whether such an evaluation was ever actually performed,[4] or whether the memorandum is even related to Kahn's June 13 letter. Moreover, there is no reference in the memorandum to the provision of treatment, nor, for that matter, is there any reference to psychiatric evaluation or treatment in the Stipulation. Thus, the Court cannot find that plaintiff was a "prevailing party" on this issue.

■■■■ Finally, plaintiff sought the use of shower and toilet facilities suitable for use by an amputee. Again, plaintiff's counsel have failed to provide evidence that plaintiff in fact prevailed on this issue. Glassman, in his affidavit, states that "[f]ollowing his return to the Auburn Correctional Facility, Defendants *purported* to provide Plaintiff with access to handicap shower and toilet facilities." Glassman Aff., ¶ 11 (emphasis added). This is hardly convinc-

---

evidence before it. Moreover, plaintiff's preliminary injunction sought general relief—that physicians "control the bone infection in his right foot"—which the present evidence indicates defendants were attempting to do. Plaintiff did not seek a specific medical technique, such as

intravenous antibiotics or debridement, to achieve that relief.

4. In fact, Kahn's affidavit states that "[o]n information and belief Dr. Dyett failed to respond to Dept. David's [*sic*] investigation demand." Kahn Aff., ¶ 6c.

ing proof that defendants actually provided plaintiff with such facilities. In fact, on August 3, 1989, plaintiff commenced a separate action, *Rivera v. Graceffo,* 89 Civ. 0945 (HGM), seeking injunctive relief and damages for, *inter alia,* the alleged failure of the defendants in that action to provide plaintiff with safe and sanitary shower and toilet facilities at Auburn. Rosas Aff., Exhibit 6. Accordingly, the Court declines to find that plaintiff prevailed on this issue.

■ Because plaintiff can be found to have prevailed, within the meaning of § 1988, solely on his demand for the provision of a diabetic diet, the Court will exercise its equitable discretion and "reduc[e] the award to account for the limited success of the plaintiff." *Texas Teachers Association, supra,* 489 U.S. at 789–90, 109 S.Ct. at 1491–92 (citing *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941); *see also Carrero v. New York City Housing Authority,* 890 F.2d 569, 581–82 (2d Cir.1989) (affirming district court decision to reduce § 1988 attorney's fee award by 35% to account for plaintiff's limited success).[5] In making that reduction, the Court is aware of the fact that the various elements of relief sought by plaintiff were largely interrelated, all pertaining to aspects of his medical, psychiatric and hygienic care. Thus, it would be unfair to reduce excessively the award by failing to recognize that there is a percentage of an attorney's time expenditure that will be required to prepare and conduct a litigation, regardless of how many claims are brought and regardless of the nature of the relief sought. Taking this fact into account, the Court will reduce the award of allowable fees by 33%.

## II. Unrelated Time Expenditures

■ A number of the time expenditures incurred by plaintiff's counsel—the bulk of them following his July 13, 1988 transfer to Auburn—are clearly unrelated to plaintiff's success in obtaining access to a diabetic diet. With respect to Glassman's pre-transfer hours, the Court will disallow recovery for 4.5 hours on July 12, 1988: "Conference w/Janine Kelly & Kahn; prepare Kelly's affidavit." It is difficult to imagine that these hours, spent discussing and preparing an expert's affidavit that was not used until days later, in any way contributed to plaintiff's transfer to Auburn the following day.[6] With respect to Kahn's pre-transfer hours, the Court will disallow recovery for 7.5 hours on July 12, 1988: "Arrange Dr. Kelly's visit to examine client, medical records review and preparation of Dr.'s report." Again, any possible causal connection between the hours spent and the relief obtained would appear to be lacking.

■ With respect to the post-transfer hours expended by Glassman and Kahn, the Court must disallow all of that time. Having obtained access to a diabetic diet for plaintiff, there is no indication that plaintiff's counsel were required to spend any additional time on that issue. If the post-transfer time spent by plaintiff's counsel on this litigation was, in fact, related to the diet issue—for example, in an effort to prevent plaintiff from being transferred to another facility without such a diet—plaintiff's counsel should have so indicated in their time records. Having reviewed those records, the Court finds no suggestion of any diet-related hours, and thus will not permit recovery for plaintiff's counsel's

---

5. Plaintiff's counsel have not indicated the specific issue that each time entry is related to, and claim that "all work goes to all the issues." Kahn Aff., ¶ 10. Accordingly, for the period prior to plaintiff's transfer to Auburn the Court cannot, with respect to most of the time expenditures, identify specific hours that should be eliminated, but rather must use a percentage reduction method. Although counsel generally "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims," *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941, the courts have recognized that this is not always possible. "But at least counsel should identify the general subject matter of his [or her] time expenditures." *Hensley, supra,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

6. The Court realizes that the same might be said for time expenditures on July 11 or July 10. A bright line is impossible to draw in this area of the law. Rather than pretend that such a line exists, the Court must fashion an award that equitably carries out the goals that § 1988 was intended to serve.

post-transfer time. *See Hensley, supra,* 461 U.S. at 433, 103 S.Ct. at 1939 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly.").

### III. Rate of Compensation

Glassman, in his affidavit, states that "[d]uring the pendency of this action, I have set my legal fees at rates of $150.00 to $180.00 per hour, which I believe to be reasonable and customary for practitioners of my experience in Westchester County." Glassman Aff., ¶ 19. Kahn, whose experience is comparable to Glassman's, does not state what her ordinary fee is. Both Glassman and Kahn have, however, requested that they be compensated at the rate of $200 per hour. Plaintiff's counsel justify this upward adjustment in their rate of compensation on the ground that they have taken this case on a contingency fee basis, and that "[b]ecause of the delays in payment always associated with contingent fee arrangements and the substantial risk that no legal fee may be awarded," Glassman Aff., ¶ 19, an upward adjustment is proper.

▮▮▮▮ However, the Second Circuit has held that, "[i]n and of itself, contingency is not a sufficient basis for awarding a lodestar bonus. Rather, it is the evaluation of the odds against success that ultimately determines whether an enhancement is merited." *Lewis v. Coughlin,* 801 F.2d 570, 575 (2d Cir.1986). In the case at bar, plaintiff's counsel make the conclusory statement that there is a "substantial risk" that no legal fee will be awarded, Glassman Aff., ¶ 19, without any apparent basis. Moreover, the likelihood of success is to be determined on the basis of how the case reasonably appeared to the bar based on its pre-trial merits. *Lewis, supra,* 801 F.2d at 575. Here, the relief sought by plaintiff—adequate medical, psychiatric and hygienic treatment—does not require counsel to make novel or marginal arguments that the Court might reject. In addition, the Court cannot ignore the fact that plaintiff's counsel themselves believed that plaintiff was *likely* to succeed on the merits, as evidenced by their argument to that effect in support of plaintiff's motion for a preliminary injunction at the beginning of this litigation. Plaintiff's Memorandum of Law in Support of a Preliminary Injunction at 7–9. Plaintiff's counsel cannot have it both ways, arguing that plaintiff is likely to succeed on the merits when seeking injunctive relief, but unlikely when seeking attorney's fees. Plaintiff's counsel's request for adjustment to $200 per hour is denied. Compensation shall be made, instead, at the rate of $165 per hour.

### IV. Expert's Fees

▮▮▮ Kahn seeks an award of $10,000 as reimbursement for expert fees paid to Dr. Kelly. However, the Supreme Court has recently held that "§ 1988 conveys no authority to shift expert fees," whether they be testimonial or non-testimonial fees. *West Virginia University Hospitals, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991). Accordingly, Kahn's request for an award for reimbursement of such fees must be denied.

### V. Calculation of Award

#### A. Glassman

| | |
|---|---|
| Total hours claimed | 83.10 |
| Disallowance for 7/12/88 | 4.50 |
| Disallowance for post-transfer hours | 24.10 |
| Hours compensated | 54.50 |
| × rate | $165.00 |
| Fee before reduction | $8992.50 |
| 33% | $2997.50 |
| Total Glassman fee award | $5995.00 |

B. Kahn

| | |
|---|---|
| Total hours claimed | 89.75 [7] |
| Disallowance for 7/12/88 | 7.50 |
| Disallowance for post-transfer hours | 31.50 |
| Hours compensated | 50.75 |
| × rate | $165.00 |
| Fee before reduction | $8373.75 |
| 33% | $2791.25 |
| Total Kahn fee award | · $5582.50 |

---

### CONCLUSION

For the reasons set forth above, plaintiff's motion for an award of interim attorney's fees, pursuant to 42 U.S.C. § 1988, is granted to the extent of $5995.00 to be awarded to Glassman, and $5582.50 to be awarded to Kahn.

SO ORDERED.

---

7. Kahn's affidavit states a claim for 88.75 hours in total. Kahn Aff., ¶ 10. However, the actual total of hours claimed in Kahn's time records is 89.75.