# Authority to Grant Conservation Easements Under 40 U.S.C. § 319

Federal agencies do not have authority to grant conservation easements in federal property under 40 U.S C. § 319.

January 19, 1993

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF COMMERCE

You have requested the opinion of the Department of Justice on whether the Secretary of Commerce has authority under 40 U.S.C. § 319 to convey to the City of Boulder, Colorado, a "conservation easement" in federal property under the control of the Department of Commerce.[1] The grant of this property interest would guarantee "the perpetual preservation of open space . . . and maximum aesthetic and environmental limitations on future construction" on the site.[2] We understand that your Office has tentatively concluded that the Department of Commerce "may not possess such authority" and has notified the city attorney for Boulder of that view.[3]

Consistent with the tentative opinion of your office, we conclude that § 319 does not provide authority to grant a conservation easement. We believe that § 319 authorizes only the conveyance of property interests that were recognized by courts as valid and customary easements under the common law existing when the statute was enacted. Although the so-called scenic or conservation easement first developed as a land use device prior to enactment of § 319, it was not then recognized as a valid or customary easement in the vast majority of jurisdictions. In the absence of any indication that Congress intended § 319 to include conservation easements, we conclude that the Department of Commerce is not authorized under § 319 to convey such an easement.

---

[1] Letter for Barry M. Hartman, Acting Assistant Attorney General, Environment and Natural Resources Division, from Wendell L Willkie, II, General Counsel, Department of Commerce (Apr. 8, 1992). Mr. Hartman referred your request to us. The Environment and Natural Resources Division has reviewed this memorandum and concurs in its conclusions.

[2] See Memorandum for Wendell L. Willkie, II, General Counsel, Department of Commerce, from Barbara S. Fredericks, Assistant General Counsel for Administration, Department of Commerce at 1 (Apr. 6, 1992) ("Fredericks Memorandum").

[3] This issue arose out of negotiations between officials of the Department of Commerce and the City of Boulder concerning the future development of 205 acres occupied by the Department's National Institute of Standards and Technology The Department was considering entering into a contractual agreement that would limit future construction on the site and preserve some of its open space See Fredericks Memorandum at 1. The city, however, wished to become the grantee of a "conservation easement" under Colorado law. *Id.*; *see* 16A Colo. Rev. Stat. § 38-30.5-102 (1982).

16

Section 319 provides in part:

> Whenever a State or political subdivision or agency thereof or any person makes application for the grant of an easement in, over, or upon real property of the United States for a right-of-way or other purpose, the executive agency having control of such real property may grant to the applicant, on behalf of the United States, such easement as the head of such agency determines will not be adverse to the interests of the United States, subject to such reservations, exceptions, limitations, benefits, burdens, terms, or conditions . . . as the head of the agency deems necessary to protect the interests of the United States. Such grant may be made without consideration, or with monetary or other consideration, including any interest in real property.

40 U.S.C. § 319. Section 319 speaks of "easement[s] . . . for a right of way or other purpose," but is silent as to what "other purpose[s]" are permitted. The statute is thus arguably ambiguous as to the meaning to be given "easement": whether Congress intended that "easement" should be given its traditional, common-law meaning or be interpreted in light of continuing legal developments.

We believe, however, that Congress intended to incorporate the common-law definition of easement into the statute.[4] We reach this conclusion by employing the "traditional tools of statutory construction," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987), to determine the "meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law." *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100 (1991) (citing 2 J. Sutherland, *Statutory Construction* § 5201 (3d Horack ed. 1943)); *see also infra* pp. 22-23 and note 14.

Section 319 was enacted in 1962. *See* Act of Oct. 23, 1962, Pub. L. No. 87-852, § 1, 76 Stat. 1129, 1129. The legislative history of § 319 demonstrates that the General Services Administration ("GSA") proposed the section to Congress because GSA had determined that the "[e]ffective and efficient administration of the real property of the United States require[d] that executive agencies have authority to grant easements." H.R. Rep. No. 87-1044, at 2 (1961); *see also* S. Rep. No. 87-1364, at 2 (1962). GSA advised that the then-existing procedures for granting easements — which for most agencies required a determination that the property rights in question were both in excess of the needs of the agency having control of the land and surplus to the needs of the federal government — were "unsatisfactory and unnecessarily cumbersome" and needed to be "simplified."

---

[4] Accordingly, there is on this question no statutory ambiguity to be resolved by the administering agency, and any different interpretation of § 319 would fail at "step one" of the test established by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

S. Rep. No. 87-1364, at 2; *see* 108 Cong. Rec. 1591 (1962) (remarks of Rep. McFall); H.R. Rep. No. 87-1044, at 2.[5]

Section 319 was patterned after specific easement-granting authority that was already vested in the Attorney General, the Secretaries of the military departments, and the head of the Veterans' Administration. *See* S. Rep. No. 87-1364, at 2; H.R. Rep. No. 87-1044, at 2. The earliest of those provisions gave the Attorney General power to convey "easements in and rights-of-way over" federal lands under his control, whenever "advantageous to the Government." Act of May 9, 1941, ch. 94, 55 Stat. 183 (1941) (codified at 43 U.S.C. § 931a).[6] The Attorney General sought this authority to address difficulties encountered in the development of sites for federal prisons. The Bureau of Prisons needed to restrict public access to certain local roads running through sites acquired for prisons, but some local officials would agree to such closures only if the federal government "grant[ed] an easement along the outside boundaries of the site[s] for the relocation of the roads." H.R. Rep. No. 77-393, at 1-2 (1941); *see* 87 Cong. Rec. 3257 (1941) (remarks of Rep. Sumners). The Director of the Bureau of Prisons explained that it was necessary to "be able to grant such easements promptly in order to take advantage of agreements made with State authorities. The delay which would ensue should each case have to be submitted to Congress for special authorization would jeopardize the interests of the Government." H.R. Rep. No. 77-393, at 2.

Although § 319 gives agency heads broad discretion in certain areas, we do not believe that Congress intended it to be construed to allow an agency to expand or alter the legal concept of "easement" as it was understood by Congress at the time of enactment. We have previously opined that § 319 "must be interpreted as authorizing [agencies] to grant easements only for those purposes for which easements have been traditionally permitted at common law." Memorandum for Allie B. Latimer, General Counsel, GSA, from Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel at 4 (June 19, 1986) ("Kmiec Memorandum"). We explained that:

> section 319 was intended to empower all agencies to grant easements over their property for any purpose for which easements

---

[5] The Senate Committee on Public Works reported that § 319 would "improve the present Government procedures for granting of easements." S Rep. No 87-1364, at 3. The committee stated:

> At present these procedures are unrealistic and result in undue delay to both the Federal Government and those dealing with it Enactment of this bill will provide effective procedures in dealing with requests for easements, necessary to effective cooperation by the Federal Government in a variety of local and Federal building programs.

*Id*

[6] *See also* Act of Aug. 10, 1956, ch 1041, 70A Stat 1, 150-51 (1956) (codified as amended at 10 U.S.C. §§ 2668-2669) (if not "against the public interest," Secretary of a military department may grant "easements for rights-of-way over, in, and upon public lands permanently withdrawn or reserved for the use of that department" for specifically enumerated purposes, including railroad tracks, pipelines, and roads), Act of Sept. 2, 1958, Pub. L. No 85-857, § 5014, 72 Stat. 1105, 1254 (codified as amended at 38 U.S.C. § 8124) (Secretary of Veterans Affairs given authority similar to Attorney General's)

18

> could be granted. We do not believe, however, that either the stat-
> ute or the legislative history can be read . . . as authorizing agencies
> to grant easements *for any purpose whatsoever*, even for purposes
> for which easements have never been recognized. In particular,
> nothing suggests that Congress intended to preempt and expand the
> common law of easements with the enactment of section 319.

*Id.* at 3-4 (footnote omitted). By "the common law of easements" we meant the American law of easements prevailing at the time of enactment of § 319. *See id.* at 4 & n.6 (listing the traditional common-law easements) (citing Restatement of Property § 450 (1944) ("Restatement") and 3 Herbert T. Tiffany, *The Law of Real Property* §§ 763-775, 839 (3d ed. 1939) (cataloguing the traditional easements)).

In 1962, an easement had a particular common-law meaning that was well set-tled. Because § 319 contains no alternative definition of the term, firmly estab-lished canons of construction compel the conclusion that Congress adopted the "established common law meaning" of the term easement recognized by courts at the time. *Chapman v. United States*, 500 U.S. 453, 462 (1991).[7] Therefore, gov-ernment agencies are not free to convey interests in federal property that go beyond the easements commonly recognized at common law in 1962.

"An easement is an interest in land in the possession of another," that, among other things, "entitles the owner of such interest to a limited use or enjoyment of the land in which the interest exists." Restatement § 450. In this case, it is helpful to distinguish between different types of traditional easements. First, an easement may be "affirmative," entitling the owner of the interest to enter upon and use the servient land (for example, a right-of-way), or "negative," enabling the easement owner to prevent the possessor of the land from doing acts upon the land that he would otherwise be privileged to do (such as obstructing the light available to the easement owner). *Id.* §§ 451-452; *see* 4 Richard R. Powell, *The Law of Real ·Property* § 34.02[2][c], at 34-16 to 34-17 (rev. ed. 1997). Second, a traditional easement is either "appurtenant," benefiting the owner of an adjacent parcel of land

---

[7] *See also Molzof v United States*, 502 U S. 301, 306-07 (1992) (construing term "punitive damages" according to its "widely accepted common-law meaning     when the [statute] was drafted and enacted" based on "cardinal rule of statutory construction" that when Congress uses a legal term of art, it "'presumably knows and adopts .   . the meaning its use will convey to the judicial mind unless otherwise instructed'") (quoting *Morissette v United States*, 342 U.S 246, 263 (1952)); *Bowen v. Massachusetts*, 487 U S. 879, 896-97 (1988) (applying "the well-settled presumption that Congress understands the state of *existing* law when it legislates" to give the statutory term "money damages" the meaning "used in the com-mon law for centuries") (emphasis added), *Edwards v. Aguillard*, 482 U S. 578, 598 (1987) ("'A fundamen-tal canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, *contemporary*, common meaning.'") (Powell, J., concurring) (emphasis added) (quoting *Perrin v. United States*, 444 U S. 37, 42 (1979), which examined "the ordinary meaning of the term 'bribery' at the time Congress enacted the statute [in question] in 1961"); *Lukhard v Reed*, 481 U.S. 368, 386 (1987) (also quoting *Perrin* regarding the "fundamental canon of statutory construction   . that, unless otherwise defined, words will be given their ordinary, contemporary, common meaning" in construing the word "income" in a statute).

(called the "dominant tenement"), or "in gross," benefiting another regardless of whether he owns or possesses other land. Restatement §§ 453-454; 4 Powell, *supra*, § 34.02[2][d], at 34-17 to 34-22.

The "conservation easement" at issue is negative and in gross. Conservation easements are negative in character because they prevent the owner of the burdened estate from developing the land, typically in any way that would alter its existing natural, open, scenic, or ecological condition. *See* Gerald Korngold, *Privately Held Conservation Servitudes: A Policy Analysis in the Context of in Gross Real Covenants and Easements*, 63 Texas L. Rev. 433, 435 (1984); Jeffrey A. Blackie, Note, *Conservation Easements and the Doctrine of Changed Conditions*, 40 Hastings L.J. 1187, 1193 (1989). Often, the benefit of the conservation easement will be in gross. *See* Restatement (Third) of Property (Servitudes) § 2.6 reporter's note, at 71 (Tentative Draft No. 1, 1989) ("Draft Restatement"). The property interest sought by the City of Boulder is expressly defined under Colorado statute as a "Conservation easement in gross." 16A Colo. Rev. Stat. § 38-30.5-102 (1982).

Traditionally, courts recognized very few types of negative easements. *See* Unif. Conservation Easement Act § 4 cmt., 12 U.L.A. 70, 76 (Supp. 1992).[8] Common law allowed only four: light, air, support of buildings, and flow of artificial streams. Dukeminier & Krier, *supra*, at 964; John J. Costonis, *The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks*, 85 Harv. L. Rev. 574, 613 (1972). Prior to the enactment of § 319, American courts had added to this short list only expressly granted "easements of view," which prevent a servient landowner from obstructing the view enjoyed by the owner of a dominant tenement. *See, e.g., Petersen v. Friedman*, 328 P.2d 264, 266 (Cal. Dist. Ct. App. 1958); *Northio Theatres Corp. v. 226 Main St. Hotel Corp.*, 231 S.W.2d 65, 67 (Ky. 1950); *McCarthy v. City of Minneapolis*, 281 N.W. 759, 761 (Minn. 1938); *see also* Dukeminier & Krier, *supra*, at 1003.[9] Moreover, the benefit of a traditional negative easement could not be in gross. *See* 2 *American Law of Property* § 8.12 (A. James Casner ed., 1952); *see also* Costonis, 85 Harv. L. Rev. at 613-14.[10]

---

[8] Negative easements were traditionally disfavored because they restricted the free use and marketability of land. *See* Jesse Dukeminier & James E Krier, *Property* 962 (1981), Note, 40 Hastings L J at 1199

[9] Although we have not been asked to address whether the grant of an easement of view would be valid under § 319, we note that an easement of view is quite distinct from a conservation easement In those jurisdictions where an easement of view is valid, the limits on development that it imposes are quite similar to those imposed by an easement of light or air. Surface development and development of the servient tenement's natural resources are normally not restricted at all, because construction on the servient tenement is permitted so long as it does not block the protected line of sight or view *over* the servient tenement from the dominant tenement *See, e g., Petersen*, 328 P.2d at 265-66. The easement of view is commonly drafted as a building height limit *Id*. In contrast to an easement of view, the so-called conservation easement at issue here would appear to prevent any development of the government land, including surface development, natural resources development, and all types of construction. Fredericks Memorandum at 1

[10] Rather than adding to the list of negative easements, American courts (following the lead of the English common law) achieved some of the purposes that might have been served through use of negative ease-

For these and other reasons, commentators have concluded that conservation easements do not fall within the sphere of traditional easements. As one commentator has explained:

> Traditionally, the law of real covenants (enforced either as covenants-at-law or as equitable servitudes) has been seen as distinct from that of easements. Courts have viewed easements as valuable and protected property rights, while treating real covenants with suspicion and subjecting them to greater barriers against enforcement. . . .
>
> . . . [A]ssuming there is validity to the traditional dichotomy between real covenants and easements, conservation servitudes more closely resemble real covenants than easements and hence should not be labeled and treated as easements. Although conservation servitudes are negative restrictions, they do not resemble any of the four traditional types of negative easements. Like real covenants, conservation servitudes are "promises respecting the use of land."

Korngold, 63 Texas L. Rev. at 436-37 (footnotes omitted); *see also* Note, *Open Space Procurement Under Colorado's Scenic Easement Law*, 60 U. Colo. L. Rev. 383, 395 (1989) ("Conservation easements, often held in gross by remote charitable organizations, might receive little judicial protection under a common law that traditionally disfavors such restrictions on land use.").

Although the use of "scenic" or "conservation" servitudes to achieve open space or other land preservation goals first developed prior to the enactment of § 319,[11] those innovative forms of servitudes had not gained wide acceptance in the courts by 1962, and certainly such interests were not considered "easements" in the traditional sense. *See, e.g.*, Jan Z. Krasnowiecki & James C.N. Paul, *The Preservation of Open Space in Metropolitan Areas*, 110 U. Pa. L. Rev. 179, 194 (1961) ("[T]he type of interest needed to accomplish open-space preservation is so unlike any easement and so like most restrictive covenants that one can expect the courts to treat them as covenants."). Under the common law, these interests, if recognized as property interests at all, would most likely have been classified as servitudes or real covenants rather than negative easements. *See* Costonis, 85 Harv. L. Rev. at

---

ments by expanding the recognition of a different property interest, the "equitable servitude," which is a promise respecting the use of land (similar to a real covenant) that is equitably enforceable. *See* Dukeminier & Krier, *supra*, at 964, 966-67, 1003

[11] *See* William A. Whyte, *Securing Open Space for Urban America: Conservation Easements* 11-14 (Urban Land Inst. Bull No 36, 1959) In the 1950s and before, governments, including the federal government, occasionally used their powers of eminent domain to acquire scenic "easements" in property adjoining parklands or highways. *See id., see also* 4 Powell, *supra*, § 34.11[3], at 34-60 to 34-61. The first "Scenic Easement Deed Act," enabling local governments to accept grants of scenic easements, was passed in California in 1959 *See* Thomas S. Barrett & Putnam Livermore, *The Conservation Easement in California* 11 (1983)

614-15 ("Characterizing a preservation restriction as an equitable servitude offers a more promising route [to recognition] than either [as a negative easement or real covenant]. Equitable servitudes are not restricted to four specific types of negative easements. . . . No privity of estate other than that provided by the agreement need exist."); *see also* 4 Powell, *supra*, § 34.11[3] at 34-158 ("*Tulk v. Moxhay*, [2. Phil. 774, 41 Eng. Rep. 1143 (Ch. 1848)] the case generally considered as establishing the doctrine of equitable servitudes, really involved [what is now being referred to as] a scenic easement.").

Indeed, it was because of the reluctance of courts to recognize this new form of property interest that many states in the 1970s and 1980s adopted conservation easement statutes, including the Colorado statute that would govern the conveyance sought by the City of Boulder.[12]

Although recent developments in the American law of property tend to blur the distinctions between negative easements and other forms of servitudes such as restrictive covenants and equitable servitudes, *see* Draft Restatement, at xxv-xxvi, and suggest that benefits in gross may someday be freely permitted for all servitudes, *see id.* § 2.6 & cmt. d, the traditional distinctions were still much in force in 1962. Accordingly, we conclude that by authorizing agencies in § 319 to convey only "easement[s]," Congress did not intend to permit an agency to encumber federal property with a nontraditional form of restrictive equitable servitude like a "conservation easement."[13]

As we stated earlier, the Supreme Court has instructed that we construe arguably ambiguous terms "to contain that permissible meaning which fits most logically

---

[12] *See* 1976 Colo Sess Laws 750, § 1 (codified at 16A Colo. Rev. Stat § 38-30.5-101 (1982)) ("The general assembly finds and declares that it is in the public interest to define conservation easements in gross, since such easements have not been defined by the judiciary."), *see also* Unif. Conservation Easement Act § 4(3), 12 U L.A. 70, 76 (Supp 1992) (providing that a conservation easement will be valid under the uniform act even though "it is not of a character that has been recognized traditionally at common law"), *supra*, note 8.

[13] Our conclusion would be the same even if we disregarded the "fundamental canon of statutory construction . . . that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning," *Perrin v. United States*, 444 U S 37, 42 (1979), and assumed that Congress intended the meaning of the term "easement" in § 319 to evolve with the common law The use of the word "easement" in the term "conservation easement," a term that does not occur in § 319, is of slight legal significance The relevant question in our analysis is whether the eventual recognition and enforcement of conservation easements — in states where they are recognized and enforced — were an outgrowth of the traditional law of easements or whether conservation easements developed independently of the common law doctrine

We have already explained that a conservation easement is closer to a restrictive equitable servitude than any type of common law easement. Even more important, however, conservation easements have come to be recognized in a body of statutory law that developed independently of the common law of easements. Thus, even if Congress intended for the meaning of the term "easement" in § 319 to evolve with the common law (and expressed such intent in the statute), there is still ample reason to conclude that a so-called "conservation easement" is not a development of the common law of easements This conclusion further supports our view that a conservation easement cannot properly be interpreted as an easement within the meaning of § 319

and comfortably into the body of both previously and subsequently enacted law."[14] As the Court explained in *United Sav. Ass'n*:

> [V]iewed in the isolated context of [a particular section of a statute], the phrase [at issue] could reasonably be given the meaning peti- tioner asserts. Statutory construction, however, is a holistic en- deavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

484 U.S. at 371 (citations omitted). We therefore examine congressional intent as it is expressed in other statutes governing the management and disposal of excess federal property, *see* 40 U.S.C. §§ 483, 484, 488, 490, as well as in the other sub- sections of 40 U.S.C. § 319. That examination provides further support for our conclusion that Congress did not intend § 319 to apply to the type of conservation easements at issue here.

With few exceptions, the management and disposal of federal government prop- erty remains a matter entrusted to the Administrator of GSA by the Federal Prop- erty and Administration Services Act of 1949, ch. 288, 63 Stat. 377 (1949) (codified as amended in scattered sections of Titles 40, 41, 44 & 50 of the United States Code). The purpose of the statute is to provide for the efficient operation of federal government property, buildings and works. 40 U.S.C. §§ 471, 483. With respect to an agency's surplus property, the Administrator must follow certain pro- cedures in the disposal or transfer of such property to maximize the benefit to the federal government as a whole. 40 U.S.C. §§ 483-490. Under these procedures, property must be reallocated within the federal government if possible prior to be- ing transferred or conveyed to private parties. 40 U.S.C. § 483(a)(1). The Ad- ministrator also has nearly exclusive control over the leasing of federal government property. 40 U.S.C. § 490(a)(13). Absent independent authority, no agency may lease or otherwise encumber federal government property without GSA approval.[15]

---

[14] *West Virginia Univ Hosps, Inc. v Casev*, 499 U S 83, 100 (1991); *see also Patterson v Shumate*, 504 U S 753, 758, 762-63 (1992) (explaining that an ambiguous statutory term should be considered "together with the rest" of the statute); *K Mart Corp v Cartier, Inc*, 486 U S 281, 291 (1988) (in discern- ing the meaning of a statute, "the court must look to . . the language and design of the statute as a whole"); *United Sav Ass'n v Timbers of Inwood Forest Assocs.*, 484 U.S 365, 371 (1988) (instructing that ambigu- ous phrases should be examined in the context of "the remainder of the statutory scheme"); *cf. Chisom v Roemer*, 501 U.S 380, 417 (1991) (Scalia, J , dissenting) ("Our highest responsibility in the field of statutory construction is to read the laws in a consistent way . . ")

[15] *Id , see also* Reorg. Plan No 18 of 1950, *reprinted in* 15 Fed. Reg 3177 (1950) ("All functions with respect to acquiring space in buildings by lease, and all functions with respect to assigning and reassigning space in buildings for use by agencies . are hereby transferred from the respective agencies in which such functions are now vested to the Administrator of General Services ").

In sum, the statutory scheme of 40 U.S.C. §§ 483-490 entrusts to the Administrator of GSA authority over the use and disposition of surplus federal property, and the transfer of substantial control over such property to private parties is disfavored. Although § 319, as proposed by GSA, is an exception to the scheme outlined in 40 U.S.C. §§ 483-490, there is no reason to believe that GSA proposed or that Congress intended to undercut or repeal by implication large portions of the more general scheme.[16] Section 319 was intended only as a limited exception to the existing law to expedite relatively limited types of grants. *See* Kmiec Memorandum at 3-4.[17] According to its principal sponsor in the House of Representatives, § 319 was proposed by GSA as "a simplified way" to grant easements over federal land without going through the "unnecessarily cumbersome" requirement of having the land declared surplus to the needs of the United States. 108 Cong. Rec. 1591 (statement of Rep. McFall). It was not intended to displace any other law. *Id.*

It is true that § 319 is broader than the authority specifically given to the Secretaries of the military departments, *see* 10 U.S.C. §§ 2668-2669, because the latter is limited to the granting of easements for specifically enumerated rights-of-way, such as pipelines and roadways, whereas § 319 allows the conveyance of an easement for a right-of-way "or other purpose." 40 U.S.C. § 319. *See* H.R. Rep. No. 87-1044, at 2; S. Rep. No. 87-1364, at 2.[18] However, this shows only that Congress intended § 319 to authorize agencies to grant *easements* for purposes other than rights-of-way; it does not suggest that Congress intended to confer granting authority for interests other than easements (as the term was understood in 1962).[19]

Consistent with this interpretation, the only example of an easement specified in § 319 is a right-of-way over federal property. In fact, in a brief exchange between the principal floor sponsor in the House, Representative McFall, and Representa-

---

[16] Subsection 319c expressly provides that the authority to convey such easements created in § 319 is not conferred with respect to the vast majority of federal land *See* 40 U S C. § 319c (excluding the public lands, including the national forests, fish and wildlife preserves, and certain other land under the control of the Secretary of the Interior as well as certain Indian trust property from the definition of "real property of the United States" as used in § 319)

[17] The Senate Committee on Public Works stated that "easements might be desired for power transmission lines, pipelines, water lines, roads, and other public utilities or public service facilities, which serve a highly useful purpose, and that if the head of the executive agency determines that such easement is not adverse to the interests of the United States, it should be granted " S Rep No 87-1364, at 3

[18] *See also* Letter for Sam Rayburn, Speaker of the House of Representatives, from John L. Moore, Administrator of GSA (June 12, 1961), *reprinted in* H R. Rep. No 87-1044, at 4 *and* Sen Rep No 87-1364, at 5 The letter explained the draft bill submitted by GSA

> Rather than limit the grant of such easements to enumerated purposes, as is done in 10 U.S C 2668 and 2669, it is felt advisable to permit the head of the executive agency having control of property to grant the easement for such purpose as he deems advisable so long as the interests of the United States will not be adversely affected.

[19] In addition to rights-of-way, other rights recognized as easements when § 319 was enacted include: watercourses, percolating waters, spring waters, grants of water power, artificial watercourses, surface waters and drains, support of land and buildings, party walls, partition fences, pews, light and air, and burial rights. *See* 3 Tiffany, *supra*, at §§ 763-775

tive Gross on whether the original bill should be placed on the unanimous consent calender, Representative McFall stated that he thought the bill was "confined to the granting of an easement *for right-of-way purposes*." 108 Cong. Rec. 1591 (emphasis added). When asked to provide examples of the types of easements that could be conferred pursuant to the bill, Representative McFall only offered the example of a right-of-way over federal property and specifically rejected other interpretations of the bill. *Id.* Satisfied by Representative McFall's assurances that § 319 would not change existing laws governing the use and disposal of federal property except to allow the grant of relatively limited types of easements, Representative Gross withdrew his reservation to allow the bill to be placed on the unanimous consent calender. *Id.*[20]

Compared to easements that confer rights-of-way, it is obvious that the scope of private control over federal property made possible by the grant of a conservation "easement" would be much more extensive. We have previously opined that an agreement referred to as an "easement" that amounts in substance to a lease of federal property is beyond the scope of § 319. *See* Kmiec Memorandum at 5-9. We explained that traditional easements are characterized by the "'requirement that the easement involve only a *limited* use or enjoyment of the servient tenement.'" *Id.* at 5 (quoting 4 Powell, *supra*, § 34.02[1], at 34-10 (rev. ed. 1997)); *see also* Restatement § 471, cmts. d and e. For this reason, we concluded that the purported easement at issue in the Kmiec Memorandum was not valid. Kmiec Memorandum at 9.

The type of conservation easement discussed in your request and the types of conservation easements authorized under the Colorado statute do not appear to be limited in scope or constrained by definition. The Colorado statute enforces the seemingly unlimited "right in the owner of the easement to prohibit or require a limitation upon or an obligation to perform acts on or with respect to a land or water area or air space above the land or water . . . appropriate to the retaining or maintaining of such land, water, or airspace . . . in a natural, scenic, or open condition." 16A Colo. Rev. Stat. § 38-30.5-102 (1982).

Thus, the scope of restrictions that may be placed on the agency's use of its land under the Colorado conservation easement statute are limited only by the imagination of the drafters of the granting instrument, § 38-30.5-103(4), and the requirement that such use restrictions be "appropriate" to the preservation of land in "a natural, scenic, or open condition," § 38-30.5-102. Moreover, the Colorado statute expressly provides that the remedies available for a breach of a conservation easement are not limited by traditional remedies at law or equity, but also include damages for "the loss of scenic, aesthetic, and environmental values." § 38-30.5-108(3). It is clear that many types of leases would involve fewer limitations on an

---

[20] Although the text of § 319 plainly authorizes the grant of an easement for a right-of-way or "other purpose," the exchange between Representatives Gross and McFall is evidence that at least some members of Congress thought such other purposes were rather limited.

agency's use of its surplus land than some types of conservation easements.[21]  In short, we do not believe that the type of conservation easement authorized by Colorado law is the type of limited easement that is covered by § 319.

Finally, we have reconsidered the legislative history of § 319, and conclude that the purposes underlying the enactment of § 319 seem to have significantly less force in the context of open space preservation.  As discussed above, the principal purpose behind § 319 was to promote the "effective administration" of federal property by allowing agencies to respond quickly to the demands of local interests that may present a relatively minor impediment to the completion of a federal land development project.  Where, on the other hand, the local interest wishes to secure the perpetual preservation of federal land by *preventing* further development, and the agency is willing to accommodate such a desire, there would ordinarily be little need for a quick conveyance of a conservation easement by the agency.  If the agency determines that such preservation is consistent with the interests of the United States, the agency may follow existing procedures for the disposal of excess property, *see* 40 U.S.C. §§ 483, 484, 488, 490, or may seek special legislative approval from Congress for such a conveyance.


DOUGLAS R. COX
*Principal Deputy*
*Assistant Attorney General*
*Office of Legal Counsel*

---

[21] There are obviously many differences between a lease and a conservation easement, particularly with regard to the possessory interests involved, but there might be little difference with respect to the non-owner's degree of control over the federal agency's use of the land that is subject to the lease or conservation easement  We adhere to the view that Congress did not intend in the passage of § 319 to create a distinction between GSA's authority to direc* and supervise leases on federal property and its authority to supervise conveyances referred to as easements that amount to a significant relinquishment of federal control over such property.