PRATT, District Judge,
concurring in part and dissenting in part.
As the majority notes, one stated purpose of the IDEA is “to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services, designed to meet .their unique needs.” 20 U.S.C. § 1400(d)(1)(A). For the most part, I believe the majority’s opinion commendably adheres to and supports this noble purpose. I agree that the School District’s failure to develop and implement an appropriate behavior management plan for Robert precluded any educational benefit. I also agree that the district court did not abuse its discretion in awarding the Clarks a reasonable attorneys’ fee. Most of all, I agree that the School District denied Robert Clark the free appropriate public education to which he was legally entitled. I do not, however, agree with the majority’s refusal to award expert witness fees under the IDEA, and I believe that such a holding runs afoul of the law, congressional intent, public policy, and,' most importantly, Robert Clark’s right to a free appropriate public education designed to meet his unique needs. I, therefore, dissent from part II. C. of the majority’s opinion.
A. Witness Fees, § 1821, and the IDEA
In Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), the Supreme Court held that “absent explicit statutory authority or contractual authorization for the tax *1034 ation of the expenses of a litigant’s witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920.” Because the IDEA’S fee shifting provision, which allows for “attorneys’ fees as part of the costs,” does not explicitly mention expert witness fees, the majority concludes that the plain language of the statute indicates that the district court was bound by the limitations set out in § 1821 and § 1920. 20 U.S.C. § 1415(i)(3)(b). In so doing, the majority discounts clear legislative history indicating that Congress intended the statute to allow for “reasonable expenses and fees of expert witnesses.” H.R. Conf. Rep. No. 99-687, at 5 (1986), reprinted, in 1986 U.S.C.C.A.N. 1807, 1808. Crediting Congress’ ability to explicitly specify a shifting of expert witness fees, the majority posits that “absent some ambiguity in the statute, we have no occasion to ■ look to legislative history.” Maj. Op. at 1032 (citations omitted). This analysis is flawed.
Quite simply, given the plain language of § 1821, the statute can not apply in the present case; nor should it limit the award of expert witness fees in any IDEA case. Title 28 U.S.C. § 1821(a) states:
(1) Except as otherwise provided by law, a witness in attendance at any court of the United States,-or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section.
(2) As used in this section, the term “court of the United States” includes, in addition to the courts listed in section 451 of this title, any court created by Act of Congress in a territory which is invested with any jurisdiction of a district court of the United States.
By its terms, § 1821 applies only to witnesses in attendance at any court of the United States, before a United States Magistrate, or a deposition taken under a court rule or order. In contrast, the IDEA’S fee shifting provision grants the district court discretion to grant “attorneys’ fees as part of the costs” in “any action or proceeding brought under this section.” ' In fact, the district court in the present case awarded attorneys’ fees as part of the costs, not for proceedings before any court of the United States, but for an administrative due process hearing before a state agency panel. The Clark’s expert witness never appeared before the district eourt-or any court of the United States, and, therefore, cannot be bound by the $40 per diem rate in § 1821(b).
Next, the nature of the IDEA and its associated due process hearings differs greatly from the federal antitrust and civil rights litigation at issue in Crawford Fitting Co. and West Virginia Univ. Hosps. v. Casey, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). Moreover, as a regulatory scheme, the IDEA is unlike any of the 34 statutes identified by Justice Scalia in Casey, wherein the statutory language provides for both attorneys’ fees and expert witnesses as part of the costs. Id. at 89, 111 S.Ct. 1138. In enacting the IDEA, Congress, by virtue of its spending power[4], conditioned the allocation of federal funds on a state’s passage of, and adherence to, the IDEA’S procedural and sub *1035 stantive regulations. See 20 U.S.C. § 1411 (Authorization; allotment; use of funds; authorization of appropriations), § 1412 (State eligibility). To ensure that disabled children received the free appropriate education to which they were entitled, Congress mandated that states enacting the IDEA establish an administrative due process proceeding presided over by a state’s executive education agency. 20 U.S.C. § 1415(a), (f).
The IDEA state due process hearings occur neither before a court of the United States, nor before a court created by an act of Congress. Rather, Congress reserved judicial review and allocation of costs to the district courts of the United States. 20 U.S.C. § 1415(i)(3)(A) and (B). In so doing, Congress places the district court in the unfamiliar role of a reviewing court whereby the district court is expected to give due weight to the findings of the state administrative hearing panel. Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3084, 73 L.Ed.2d 690 (1982). The district court must then base an award of costs on a review of the state hearing panel proceedings. Included in this award are witness fees for expert witnesses whom the parties have a stated right to have present at the state hearing, but who are contemplated neither in the plain language of § 1821, nor in the statutes cited or otherwise at issue in Crawford Fitting Co. or Casey.
Of course, citing differences between the IDEA and other statutes that do contain explicit expert witness fee shifting provisions does little to compel such an award in the present case. As Justice Scalia suggested in Casey “in our view this undercuts rather than supports [the] position.” Casey, 499 U.S. at 91, n. 5, 111 S.Ct. 1138. In referring to the same House conference report discounted by the present majority, Justice Scalia noted “the statement is an apparent effort to depart from ordinary meaning and to define a term of art.” Id. (emphasis in original). As the state hearing panel proceedings from which the district court must award fees depart from the ordinary meaning of federal litigation, Congress had occasion to define a term of art. The IDEA’S clear legislative history provides the intended definition:
The conferees intend that the term ‘attorneys’ fees as part of the costs’ include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian’s case in the action or proceeding, as well' as traditional costs incurred in the course of litigating a case.
H.R. Conf. Rep. No. 99-687, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 1807,1808. Given the nature of the state due process hearings mandated by the IDEA, the district courts are wise to turn to the statute’s legislative history for guidance when awarding reasonable attorneys’ fees as part of the costs.
B. The IDEA’S Policy Mandate
Beyond Congress’s clear legislative intent, the nature and purpose of the IDEA compels an award of expert witness fees as part of the costs. In amending the IDEA to its current form, Congress found that:
(2) Before the date of the enactment of the Education for All Handicapped Children Act of 1975 (Public Law 94-142) [enacted Nov. 29,1975]—
(A) the special educational needs of children with disabilities were not being fully met;
(3) Since the enactment and implementation of the Education for All Handicapped Children Act of 1975 [enacted Nov. 29, 1975], this Act [20 USCS §§ 1400 et seq.] has been successful in *1036 ensuring children with disabilities and the families of such children access to a free appropriate public education and in improving educational results for children with disabilities.
(4) However, the implementation of this Act [20 USCS.§§ 1400 et seq.] has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities.
20 U.S.C. § 1400(c).
In response to noted challenges in implementing the previous Education for All Handicapped Children Act of 1975, Congress passed the IDEA to ensure:
(1) (A) that all children with disabilities have available to them a free appropriate public education ... designed to meet their unique needs...;
(B) that the rights of children with disabilities and parents of such children are protected; and
(3) that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting systemic-change activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services;
20 U.S.C. § 1400(d).
The majority’s conclusion that the prevailing parents of a disabled child are not entitled to recover fees for expert witnesses under the IDEA subverts the very purposes for which the statute was enacted. Parents prevailing in an IDEA action receive no compensatory or punitive damages. Thompson v. Board of the Special Sch. Dist. No. 1, 144 F.3d 574, 580 (8th Cir.1998) (quoting Heidemann v. Bother, 84 F.3d 1021, 1033 (8th Cir.1996)). Rather, the purpose of an IDEA due process action is to ensure that the rights of disabled children and their parents are protected, and that the disabled child receives the free appropriate public education to which he or she is entitled. To enforce these rights, however, the disabled child and his or her parents must square off against the child’s own school and its resources.
School districts, thankfully, employ many education and child experts. Schools turn to these in house experts in developing special education programs for disabled students. In working with parents to ensure that their child is receiving an appropriate education, the school district and its experts are certainly not immune to disagreement. In such a case, the IDEA guarantees the parents the right to bring the matter before a state administrative hearing panel. The IDEA mandates that all parties be accorded “the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities.” 20 U.S.C. § 1415(h)(1). As one might expect, school districts again look to their in house experts to testify on behalf of the school district’s position. And, although parents are afforded the right to counsel, attorneys are not equipped to advocate the specifics of what constitutes a free appropriate public education designed to meet the unique needs of the disabled student. If, however, parents can recover only their attorneys’ fees, those parents who lack the resources to hire an expert witness to evaluate and testify on behalf of their child are left with nothing but their attorney to protect their rights. The testimony of the school district’s expert, therefore, goes unchallenged. As the present case illustrates, the school district’s position is not always correct. Accordingly, expert witness testimony on both sides plays an integral part in IDEA due process hearings. To deny a prevailing parent the right to recover the fees paid to an expert witness *1037 forecloses the likelihood that many underprivileged children will receive the free appropriate public education to which they are entitled. Such an action diminishes rather than protects the rights of disabled children.
C. The Need for Expert Witnesses
The present case demonstrates the imperative need for disabled children and their parents to be able to enlist the support of expert witnesses when seeking to enforce the child’s rights under the IDEA. Here, the School District left the task of ensuring that Robert Clark received an appropriate education with its Director of Special Services, Michael Bilderback. Bilderback served as the School District’s representative in the Clarks’ first settlement agreement. He presided over all of Robert’s IEP meetings, and oversaw the implementation-or lack thereof-of the IEPs. When disputes arose between the School District and the Clarks, Bilderback again served as the District’s representative. As the District representative at the state due process hearing, Bilderback testified as the District’s expert witness, and vigorously defended the District’s efforts to provide Robert with a free appropriate public education. While one might argue the desirability of such an acute involvement, the reality of the situation is deeply troubling.
During the school year leading to the state due process hearing, the Clark’s relationship with Mr. Bilderback devolved into a power struggle focused not on the needs of Robert Clark, but simply on winning. The district court’s opinion reflects this attitude, noting “the Court’s decision in this regard is guided, to a certain extent, by its puzzlement over the litigious nature of this proceeding.” (Appellant’s Add. at 10). For the parties involved, the power struggle between the Clarks and the School District, via Mr. Bilderback, became a severe obstacle to any progress on Robert’s behalf. In February, 1998, both Kerri Muns, Program Director for the Ju-devine Autism Project, and Cecilia Callahan, Director of Advocacy for the Missouri Protection and Advocacy Services, wrote to Mr. Bilderback and asked him to remove himself from Robert Clark’s IEP team. (Appellant’s App. at 1151, 1163). In her letter, Ms. Muns stated: “I feel there is a power struggle going on between yourself and the Clark family. We have met continuously for a year now and still have gotten nowhere when it comes to diagnosis and inclusion.” (Id at 1151). At the state due process proceedings, Victoria Atkinson, an area supervisor with the Missouri Department of Education, Division of Special Education, testified that her dealings with Mr. Bilderback, regarding Robert Clark or any child, were marked by indifference, false assurances, and frustration. (Id at 267-269). Ms. Atkinson further testified that, unlike with any other director of special services, she immediately notified her supervisor after any dealings with Mr. Bilderback, because a number of complaints had been issued against the Neosho School District. In concluding her testimony, the Missouri Department of Education area supervisor simply stated, “Mr. Bilderback was a jerk.” (Id at 273).
Regardless of the many requests for Mr. Bilderback to remove himself from the process, he remained on as the school district’s representative. In fact, the problems between the Clarks and Mr. Bilderback were so severe that the Clarks expressed concern about whether Robert could return to the District without incurring great animosity.[5] When the Clarks *1038 had their opportunity to argue before the state due process panel, they once again found themselves in a battle with Michael Bilderback as the School District’s representative and quasi-expert witness. In his testimony, Bilderback argued that the school district had met and exceeded the requirements of the IDEA; that Robert Clark had received an educational benefit; and that Robert Clark had received a free appropriate public education. Absent the presence of Dr. Morrow, the Clarks’ expert witness, Mr. Bilderback would have been the lone expert testifying on the adequacy of the School District’s efforts.
As it was, the Clarks were fortunate enough to have Dr. Morrow testify on Robert’s behalf. The state hearing panel chose to credit Dr. Morrow’s testimony over that of Mr. Bilderback’s, and the state hearing panel, the district court, and now this Court all concluded that the School District failed to provide Robert with ' a free appropriate education. In reaching its conclusion, the state panel found that Mr. Bilderback “made little or no attempt to put together a behavior management plan”, and that “he showed little leadership in addressing the behavior problems of the Petitioner.” (Appellant’s Add. at 28). Furthermore, the state hearing panel relied heavily on Dr. Morrow’s expert testimony in finding that the School District had no one on its staff with the expertise to adequately meet Robert’s needs. Restated, because of Dr. Morrow’s testimony, the state hearing panel, the district court, and this Court concluded that the School District had failed to meet any of the IDEA’S three stated goals. Yet, without the testimony of Dr. Morrow, the uncontested opinions of Mr. Bilderback could have carried the day. Such a scenario subverts the very purpose of the IDEA.
In defending the rights of their son, the Clarks did not have resources of a school district, staffed with a number of education and child experts. Nor were they represented by a large private law firm. No, the Clarks were simply parents who believed that their son’s school district had denied him the free appropriate public education to which he was entitled. In their fight to protect their son’s rights, they relied on the Missouri Protection and Advocacy Services, “a federally mandated system ... which provides protection of the rights of persons with disabilities through [free] legally based advocacy.” Missouri Protection and Advocacy Services Home Page, (visited Dec. 16, 2002) < http://members, sockets, net/~mo-pasjc/MOP & A.htm>. Thus, to ensure that their son received a free appropriate public education, the Clarks have relied on one publically funded organization to challenge the resources of the school district, another publically funded entity. Under the majority’s holding, the Clarks, and any other parent in like circumstances, will still end up incurring significant debt to ensure that their child receives a free education. This assumes, however, that the parents have the ability to hire an expert in the first place. If not, the rights of the disabled child are left to the school district to decide. This could not have been Congress’s intent when it amended the IDEA to its present form.
D. Conclusion
The IDEA does not provide all parents with the opportunity to recover attorneys’ fees as part of the costs. It is only where the parents prevail after showing that their child’s school failed-or is failing-to provide their disabled child with an educational benefit to which he or she is legally entitled that the parents can hope to *1039 recover the costs involved in enforcing their disabled child’s rights. The need for expert advocacy to protect the rights of the child is undeniable and undisputed. The fundamental purposes of the IDEA are attainable only when disabled children can rely on the support of expert witness testimony in due process proceedings. The law does not constrain the award of expert witness fees with the same per diem limitations as in ordinary litigation. Rather, the ambiguous character of the IDEA’S fee shifting provision compels reference to the Act’s legislative history, wherein one finds a clear statement of congressional intent to include expert witness fees as part of the costs.
The IDEA does not limit its benefits to only those who can afford to recoup them. Quite the contrary, the IDEA seeks to ensure that all disabled children, whether rich or poor, receive a free appropriate public education designed to meet their unique needs. In deciding this question of whether parents who prevail in an action to enforce the rights of their child should be entitled to recover expert witness fees as part of their costs, we are called upon to uphold the rights of the disabled and the poor. Because I believe the majority’s decision today fails to adequately protect the right of all disabled children to a free appropriate public education,
I respectfully dissent.

. Had Congress simply mandated that state governments pass the IDEA regulations, or enacted the IDEA as a federal scheme with directives to state agency officials, the Act would likely be an unconstitutional encroachment on state sovereignty. See New York v. U.S., 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding that Congress may not direct a state to enact or enforce a particular law or type of law); Printz v. U.S., 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Congress may not commandeer the executive branch of a state government and compel it to do even' ministerial tasks).

. The state hearing panel apparently agreed with thé Clarks. In light of the fact that Mr. Bilderback testified that he would not be returning to the District, the panel found "that there is no animosity towards Petitioner among those members of the Respondent's *1038 staff who will be employed during the next school year.” (Appellant's Add. at 29).